Elizabeth GUCKENBERGER, et al., Plaintiffs,

v.

BOSTON UNIVERSITY, et al., Defendants.

Civil Action No. 96–11426–PBS.

United States District Court, D. Massachusetts.

Aug. 15, 1997.

Frank J. Laski, Newton, MA, Sidney Wolinsky, Sid Wolinsky, Guy B. Wallace, Laurence W. Paradis, Disability Rights Advocates, Oakland, CA, William J. Hunt, William F. Ahern, Jr., Henry W. Clark, Michael B. Newman, Clark, Hunt & Embry, Cambridge, MA, for plaintiffs.

Lawrence S. Elswit, Michael B. Rosen, Office of General Counsel, Judith A. Goldberg, McDermott, Will & Emory, Alan D. Rose, Alan D. Rose, Jr., Rose & Associates, Erika Geetter, Boston, MA, for defendants.

Dale C. Kerester, Jager, Smith, Stetler & Arata, Boston, MA, Jo Anne Simon, Law Offices of Jo Anne Simon, Brooklyn, NY, for Loring Brinkerhoff.

Reed Martin, Law Office of Reed Martin, Houston, TX, for other interested parties.

### FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER OF JUDGMENT

SARIS, District Judge.

### INTRODUCTION

This is a class action[1] brought by students with Attention Deficit Hyperactivity Disorder ("ADHD"), Attention Deficit Disorder ("ADD"), and learning disorders (collectively "learning disabilities") against Boston University ("BU") under the Americans with Disabilities Act ("ADA"), 42 U.S.C.A. § 12101 *et seq.* (West Supp.1995), the Rehabilitation Act, 29 U.S.C.A. § 794 (West Supp. 1997), and state law.[2] The class claims that BU discriminates against the learning-disabled by: (1) establishing unreasonable, overly- burdensome eligibility criteria for qualifying as a disabled student; (2) failing to provide reasonable procedures for evaluation and review of a student's request for accommodations; and (3) instituting an across-the-board policy precluding course substitutions in foreign language and mathematics. BU contends that its eligibility criteria are reasonably designed to ensure that a student is entitled to the requested accommodations, that its review procedures are adequate, and that it has the right to require that a student meet certain levels of proficiency in math and foreign language before it confers a liberal arts degree.

Particularly with respect to the issue of course substitution, this class action concerns the interplay between the rights of learning-disabled students to reasonable accommodation and the rights of institutions of higher education to establish and enforce academic standards.

The plaintiff class now seeks injunctive and declaratory relief against the continued implementation of BU's accommodations policy. Moreover, the named individuals[3] request compensatory damages for the harm allegedly caused them by the university's purported violation of federal law, and by its alleged breach of the promotional promise to provide reasonable accommodations for students with diagnosed learning disabilities.

After a two-week bench trial, and an evaluation of the witnesses and evidence in this case, I have made numerous findings of fact and conclusions of law. To assist the reader, the Court's fundamental conclusions are summarized as follows:

1. Federal law prohibits private and public universities, colleges and post-secondary educational institutions from discriminating against students with specific learning disabilities.

2. In the fall of 1995, BU imposed new documentation requirements that required students with learning disabilities to be retested every three years, and that provided that evaluations by persons who were not physicians, clinical psychologists, or licensed psychologists were unacceptable. These new documentation requirements, as initially framed, violated the ADA and the Rehabilitation Act because they were "eligibility criteria" that "screen[ed] out or tended to screen

---

1. The plaintiff class consists of all students with learning disabilities and/or attention deficit disorder who are currently enrolled at BU. *See Guckenberger v. Boston Univ.,* 957 F.Supp. 306, 327 (D.Mass.1997). The Court certified a class pursuant to Fed.R.Civ.P. 23(b)(2) only with respect to declaratory and injunctive relief for alleged violations of the ADA and the Rehabilitation Act. The Court did not certify a class with respect to individual claims for compensatory damages, or the breach of contract claims.

2. Counts I and II of the complaint allege discrimination in violation of the ADA and the Re-

habilitation Act respectively; Count III alleges violation of Article 114 of the constitution of the Commonwealth of Massachusetts, and Count V alleges breach of contract.

3. Elizabeth Guckenberger, MacLean Ports Bishop, Avery LaBrecque, Andrea Schneider, Benjamin Freedman, Jill Cutler, Scott Greeley, Michael Cahaly, and Jordan Nodelman. As the parties were notified, this Court will only be assessing damages with respect to students who testified in court or via videotaped deposition.

out" students with specific learning disabilities, and because BU did not demonstrate that the requirements were necessary to the provision of educational services or reasonable accommodations.

3. The documentation policies have changed, however, since the start of this litigation. Because BU now permits a student to obtain a waiver of the three-year currency retesting requirement where medically unnecessary, I conclude that the retesting requirement, as currently framed, does not screen out or tend to screen out learning disabled students.

4. BU has also restructured its policy with respect to the qualifications of evaluators by permitting evaluators with doctorates in education (and in "other appropriate specialties") to document students' learning disabilities. Nevertheless, by precluding any evaluations by persons with masters degrees, BU's present policy still unnecessarily screens out or tends to screen out some students with specific learning disorders who have been evaluated by adequately trained professionals. BU has not demonstrated that an evaluator with a masters degree and appropriate training and experience cannot perform the testing for an assessment of learning disability as well as an evaluator with a doctorate. Accordingly, BU has not proven that a doctorate-level of qualification is necessary to the provision of reasonable accommodations with respect to students with learning disorders.

5. However, with respect to students with ADD and ADHD, BU has demonstrated that its "bright line" policy of requiring current evaluation by a person with a doctorate is necessary because ADD/ADHD is often accompanied by co-existing physical and psychological conditions, is frequently treated by medications, and is a rapidly changing condition that usually remits over the period from adolescence through early adulthood.

6. The administration of BU's new accommodations policy during the 1995–1996 school year violated the ADA and the Rehabilitation Act because it was implemented without any advance warning to eligible students, in such a way as to have the effect of delaying or denying reasonable accommodations. Moreover, BU President Jon Westling and his staff administered the program on the basis of uninformed stereotypes about the learning disabled.

7. However, because BU has recently hired an experienced clinical psychologist to review student accommodation requests, and because President Westling and his assistant Craig Klafter now review recommended accommodations primarily to ensure that they meet academic standards, the university's current procedure for evaluating requests for accommodation submitted by students with learning disabilities does not violate federal law.

8. The plaintiff class has no private right of action to challenge BU's violation of Rehabilitation Act regulations that require a university to adopt grievance procedures that incorporate appropriate due process standards.

9. In general, federal law does not require a university to modify degree requirements that it determines are a fundamental part of its academic program by providing learning disabled students with course substitutions.

10. Here, BU's refusal to modify its degree requirements in order to provide course substitutions, particularly in the area of foreign languages, was motivated in substantial part by uninformed stereotypes by the President and his staff that many students with learning disabilities (like the infamous, non-existent "Somnolent Samantha") are lazy fakers, and that many evaluators are "snake oil salesmen" who overdiagnose the disability.

11. BU failed to demonstrate that it met its duty of seeking appropriate reasonable accommodations for learning disabled students with difficulty in learning foreign languages by considering alternative means and coming to a rationally justifiable conclusion that the available alternative (i.e., a course substitution) would lower academic standards or require substantial program alteration. Rather, the university simply relied on the status quo as the rationale for refusing to consider seriously a reasonable request for modification of its century-old degree requirements.

12. Plaintiffs have failed to demonstrate that a request to modify the degree requirement in mathematics is reasonable in light of the dearth of scientific evidence that any specific learning disability in mathematics (i.e.dyscalculia) is sufficiently severe to preclude any student from achieving sufficient proficiency in mathematics to meet BU's degree requirements with appropriate accommodations.

13. BU breached its contract with three of the named plaintiffs by failing to honor the express representations of its representatives about the students' ability to document their disabilities and to receive accommodations from the university.

## FINDINGS OF FACT

### I. *BU's Recruitment of the Learning Disabled*

BU is one of the largest private universities in the United States, with 20,000 students, 2,000 faculty members, and fifteen undergraduate and graduate colleges that offer 150 separate degree-granting programs. The College of Arts and Sciences is the largest college in the university. It has long-standing course requirements, including one semester of mathematics and four semesters of a foreign language. Degree requirements at all of BU's colleges are approved by the Provost, the President, and the Board of Trustees.

Before 1995, BU was a leader among educational institutions in seeking to provide comprehensive services to students with diagnosed learning disabilities. The university recruited learning-disabled enrollees by establishing the Learning Disabilities Support Services ("LDSS"), a renowned accommodations program that functioned as a unit within BU's Disability Services office ("DSO"). LDSS was often described as a "model program." Through LDSS, the university declared a commitment to enabling students with learning disabilities to reach their maximum academic potential. For example, LDSS promotional brochures offered learning-disabled students various complimentary accommodations including notetaking assistance, and extended time on examinations. For a fee, students who enrolled at BU also had access to comprehensive services such as private tutoring and support groups, while potential enrollees of the university had the option of attending two different summer programs geared toward helping learning-disabled pupils make the transition from high school to college.

Before 1995, not only did LDSS often authorize in-class notetakers, tape-recorded textbooks, and time and one half on final examinations for students with documented learning disabilities (the so-called "vanilla" accommodations),[4] but LDSS staff also occasionally recommended that disabled students receive a course substitution for required mathematics and foreign language classes. For example, students who received an LDSS recommendation for a math substitution were allowed to take classes such as Anthropology 245 ("Anthropology of Money"), Economics 320 ("Economics of Less Developed Regions"), or Geography 100 ("Introduction to Environmental Science") instead of the required math curriculum. Similarly, learning-disabled students who received a foreign language exemption might opt instead for one of several foreign culture courses including Art History 226 ("Arts of Japan") or History 292 ("African Colonial History").

In developing lists of "approved" course substitutions and recommending waivers of math and foreign language requirements for certain students, LDSS worked with the heads of the various academic departments at the College of Liberal Arts ("CLA") (now called the College of Arts and Sciences) ("CAS"). However, neither LDSS nor CLA notified or sought the approval of the President, Provost, or any other member of BU's central administration. Eighty-eight students requested foreign language waivers at CLA during academic years 1992–1993 and 1993–1994.[5] On average, BU granted ap-

---

4. This term was dubbed by plaintiff's expert witness, Dean Robert Shaw of Brown University.

5. The evidence at trial suggest that there were only two requests for math substitutions, but the record is unclear on the point.

proximately 10 to 15 requests for course substitutions a year.

Prior to 1995, the process of applying for accommodations, including course substitutions, from BU was relatively straightforward. A learning-disabled student submitted to LDSS a description of her need for accommodation, a statement of her accommodations history, and a current medical or psycho-educational evaluation (one that had been conducted within three years of entering the university). Once the student's documentation was filed, members of the LDSS staff determined whether accommodation was appropriate. In 1995, LDSS was permanently staffed with a full-time director, two assistant coordinators and a secretary, and it also employed several part-time learning disabilities specialists. Several of these administrators had specific training in special education and in the provision of accommodations to post-secondary students with learning disabilities.

If LDSS granted a student's request for accommodation, the student would be notified. An LDSS staff member would also write letters, referred to as "accommodations letters," to the student's faculty members and to the dean of the student's particular school explaining the student's disability and recommending that the student be provided with the listed accommodations. Students were responsible for distributing these letters to their professors, and for meeting with their instructors to arrange the provision of in-class and exam accommodations.

The results of LDSS's "marketing" to students with learning disabilities were pronounced. In academic year 1990–1991, 42 students who self-identified as learning disabled applied, 24 were accepted and two enrolled. Four years later, 348 such students applied, 233 accepted and 94 enrolled. In late 1995, 429 learning-disabled students applied to the university. As its reputation developed, BU was recommended by guidance counsellors and college manuals as a desirable academic setting the learning disabled. Between 1990 and 1996, hundreds of students with learning disabilities came to BU and registered for academic accommodations and/or comprehensive services through LDSS. By the 1995–1996 school year, BU had approximately 480 learning disabled students.

## II. *Westling Orders Change*

Current BU president Jon Westling became the university's provost (i.e., its chief academic officer) in 1985. A graduate of Reed College and a Rhodes Scholar, Westling has spent a total of 23 years at BU. He has served as both an administrator and as a teacher in the humanities core curriculum at the CLA. Westling holds no graduate degrees.

In the spring of 1995, Provost Westling[6] discovered that LDSS and CLA had been allowing students with learning disabilities to substitute other classes for the mathematics and foreign language coursework that was otherwise a long-standing prerequisite to obtaining a baccalaureate degree in the College of Arts and Sciences.[7] Chagrined that LDSS was facilitating alterations of the core curriculum without university approval, Westling assigned his assistant and troubleshooter, Craig Klafter, a Ph.D in Modern History, to research learning disabilities in general and LDSS's process of granting accommodations in particular. Confronting LDSS-director Loring Brinckerhoff, Klafter sought proof of the existence of a disability that prevented a student from learning a foreign language. Brinckerhoff referred Klafter to a book that he had co-authored concerning learning disabilities in post-secondary education. After reading Brinckerhoff's book and other secondary materials, Klafter determined that there was no scientific proof of the existence of a learning disability that prevents the successful study of math or foreign language.

As a result of Klafter's investigation, in June of 1995 Westling informed W. Norman Johnson, BU's Vice President and Dean of Students, and the College of Liberal Arts that the university was to cease granting

---

6. Westling assumed the office of university president on June 1, 1996.

7. Other schools at Boston University, like the Metropolitan College, do not have a language requirement.

course substitutions, "effective immediately." In addition, Westling told Johnson to direct LDSS to send all accommodation letters to the Provost's office for review before they were distributed to the students or faculty. Westling made the decision to end the course substitution practice without convening any committees or panels, and without speaking to any experts on learning disabilities or to any faculty members on the importance of math and foreign language to the liberal arts curriculum. With the course substitution "bee" in his academic bonnet, Westling decided to become personally involved with the accommodations evaluation process, even though he had no expertise or experience in diagnosing learning disabilities or in fashioning appropriate accommodations.

## III. "Somnolent Samantha"

At around the time that Westling ordered the first changes in the accommodations practice at BU, he also began delivering speeches denouncing the zealous advocacy of "the learning disabilities movement." In addresses delivered in Australia and in Washington, D.C., Westling questioned the rapidly increasing number of children being diagnosed with learning disorders, and accused learning-disabilities advocates of fashioning "fugitive" impairments that are not supported in the scientific and medical literature. Although Westling's orations recognized a need to "endorse the profoundly humane goal of addressing the specific needs of individuals with specific impairments," his public addresses resonated with a dominant theme: that "the learning disability movement is a great mortuary for the ethics of hard work, individual responsibility, and pursuit of excellence, and also for genuinely humane social order."

At the beginning of one such speech entitled "Disabling Education: The Culture Wars Go to School," which was delivered on July 22, 1995, Westling introduced a student named Samantha, who was, he said, a freshman in one of his classes at BU. Westling recounted how Samantha approached him on the first day of class and how, "shyly yet assertively," she presented a letter addressed to him from the Disability Services office.

The letter explained that Samantha had a learning disability "in the area of auditory processing" and would need the following accommodations: "time and one-half on all quizzes, tests, and examinations;" double-time on any mid-term or final examination; examinations in a room separate from other students; copies of my lecture notes; and a seat at the front of the class. Samantha, I was also informed, might fall asleep in my class, and I should be particularly concerned to fill her in on any material she missed while dozing.

Westling's speech went on to name the student "Somnolent Samantha" and to label her "an unwitting casualty of the culture wars." To Westling, Samantha exemplified those students who, placated by the promise of accommodation rather than encouraged to work to achieve their fullest potential, had become "sacrificial victims to the triumph of the therapeutic." Throughout his twenty-page address, Westling reiterated the view that, by "seiz[ing] on the existence of some real disabilities and conjur[ing] up other alleged disabilities in order to promote a particular vision of human society," the learning disabilities movement cripples allegedly disabled students who could overcome their academic difficulties "with concentrated effort," demoralizes non-disabled students who recognize hoaxes performed by their peers, and "wreak[s] educational havoc." In closing, Westling remarked:

The policies that have grown out of learning disabilities ideology leach our sense of humanity. We are taught not that mathematics is difficult for us but worth pursuing, but that we are ill. Samantha, offered the pillow of learning disability on which to slumber, was denied, perhaps forever, access to a dimension of self-understanding.

Westling fabricated the student named Samantha to illustrate his point regarding students with learning disorders. Remarkably, at trial, Westling admitted not only that such a student never existed, but that his description of her did not even represent a prototype of the learning-disabled students he had encountered. Rather, Somnolent Samantha represented Westling's belief—fuelled mostly by popular press and anecdotal accounts—

that students with learning disabilities were often fakers who undercut academic rigor.

As in the speech "Disabling Education," since the spring of 1995, many of Westling's addresses, statements, and letters regarding accommodations for the learning disabled have reflected his opinion that "hundreds of thousands of children are being improperly diagnosed with learning disabilities by self-proclaimed experts who fail to accept that behavioral and performance difficulties exist." Even though Westling has referred to students with learning disabilities as "draft dodgers" and has repeatedly voiced his concern that students without established learning disorders might be faking a disability to gain an educational advantage, to date, there has not been a single documented instance at BU in which a student has been found to have fabricated a learning disorder in order to claim eligibility for accommodations.

## IV. The Twenty-Eight Files

By the fall semester of the 1995–1996 academic year, BU was at a bureaucratic impasse. LDSS head Loring Brinckerhoff[8] was ignoring Westling's directives, and LDSS was continuing the practice of approving course substitutions and granting accommodations without Westling's involvement. Although Dean Johnson had specifically conveyed Westling's orders to Brinckerhoff in a memo dated June 29, 1995, LDSS issued 58 accommodations letters (some of which allowed course substitutions) to students between July and September of 1995 without seeking Westling's approval.

Irate that his mandates were being disregarded, in October of 1995, Westling directly ordered that all of the accommodations letters that LDSS had prepared but that had not yet been picked up by the affected students be delivered to his office. At the time, LDSS held 28 such letters. Westling also requested that he be given access to the documentation files for each of the students who were the subject of the 28 letters.

After receiving the letters and files, Westling and his staff reviewed the documentation to determine if the students' evaluations actually supported LDSS's recommended accommodations. Specifically, when reviewing the files, the provost's office looked for current evaluations done by credentialed evaluators, clear diagnoses, an evaluator's recommendation listing specific accommodations, and an LDSS recommendation that was consistent with the recommendations made by the student's evaluator. None of the provost office staff members who were involved in this review had any expertise in learning disabilities.

In a letter dated November 2, 1995, Westling communicated his analysis of the letters and files to Brinckerhoff's supervisor, the director of the Office of Disability Services, William P. ("Kip") Opperman. Of the 28 files, Westling determined that, "[i]n all but a few cases, the requested accommodations [were] not supported by the attached documentation." With respect to several of the students, Westling reached the reasonable conclusion that there was actually "insufficient information" to determine whether or not students were entitled to accommodation because the documentation provided by LDSS was not current, did not support the requested accommodation, or was missing.[9] For example, in regard to one student, Westling states that the testing psychologist "does not say [the student] is incapable of learning a foreign language," only that the student " 'has had a history of difficulty with foreign language.' " Rather than authorizing a course substitution as LDSS had done, Westling remarks that the student should be "encouraged to avail himself of the tutoring available to him through the University." With respect to other students, Westling incorrectly determined that the documentation did not support a claim of learning disability.

After describing in detail the perceived shortcomings of each file, Westling's letter to Kip Opperman concludes:

---

**8.** In fairness to Brinckerhoff, I hasten to mention that neither side called him as a witness to present his version of events.

**9.** These concerns about the adequacy of documentation were confirmed in part by Linda Seigel, Ph.D., defendant's expert in learning disabilities. However, Seigel also disagreed with several of Westling's conclusions.

[I]t is clear to me that the staff of the Learning Disabilities Support Services does not meet any reasonable standard of professional competence in their field. There is also considerable evidence that in addition to being incompetent, the staff has willfully and knowingly undermined University academic standards, distributed false information about University policy, and directly disobeyed University policy. I do not know whether it is possible to make Learning Disabilities Support Services perform its appropriate functions under its current management and with its current staff. While I am still considering this issue, I strongly advise you to take the corrective actions indicated in this letter.

Among the "corrective actions" Westling suggests throughout the letter are: (1) that students "be required to provide *current* evaluations" in light of federal guidelines stating that evaluations that are more than three years old are unreliable; (2) that the evaluations provide actual test results that support the tester's conclusions; (3) that "[i]ndividuals who provide evaluations of learning disabilities should be physicians, clinical psychologists or licensed psychologists and must have a record of reputable practice"; (4) that all requests for accommodation contain an analysis by LDSS staff, an academic history of the student, and the student's academic status at BU; and (5) that LDSS "should not misinform students that course substitutions for foreign language or mathematics requirements are available." Although Westling had no evidence that learning disabilities changed or abated after students finished high school, he mandated that BU students provide current evaluations (i.e., those that are less than three years old) on the basis of regulations promulgated by the Department of Education for grades kindergarten through twelve. In establishing standards for the credentials of evaluators, Westling relied on consultations with doctors at BU's School of Medicine that Klafter sought in late 1995.

In crafting the November 2, 1995 letter to Opperman, Westling did not intend for LDSS to deny all accommodations to the students whose files he reviewed. Rather, Westling hoped to castigate ODS officials regarding the office's method of approving accommodation requests for students who claimed to have a learning disability, and to obtain better documentation prior to granting a requested accommodation. Nonetheless, as a result of Westling's correspondence, Brinckerhoff sent a letter on behalf of LDSS to most of the 28 students whose files Westling had reviewed, denying the student's request for accommodation and informing the student of his right to appeal the decision to the Provost. For example, in a letter dated December 3, 1995, addressed to named plaintiff Scott Greeley, Brinckerhoff states that Greeley's request for accommodation "was reviewed" and that "the proposed accommodation of requiring the instructor to provide an opportunity to clarify test questions is not supported by the 'educational therapist' who evaluated you." As a further example, in the fall of 1995, plaintiff Michael Cahaly received an accommodations letter from the LDSS office authorizing him to receive up to double time on his exams and to use a notetaker in his classes. However, in December 1995, he received another letter refusing accommodation because his evaluation was not conducted within the past three years. Cahaly had never been informed that there was any problem with the qualifications of his evaluator.

LDSS staff members later told several worried students to disregard Brinckerhoff's letter denying accommodations; however, no formal letter or statement retracting the denial of accommodations was ever issued.

### V. *Chaos*

On December 4, 1995, Brinckerhoff sent a form letter to all BU students who had previously registered with LDSS. The letter, which purported "to inform [students] of recent policy changes at LD Support Services," stated that the following requirements must be fulfilled by January 8, 1996, if students were to remain eligible for accommodations through LDSS:

(1) Students whose documentation was more than three years old "must be reevaluated in order to continue to receive services

and accommodations through the LDSS office;"

(2) Students must submit to LDSS documentation of a learning disability that has been prepared by "a licensed psychologist, clinical psychologist, neuropsychologist, or reputable physician;" and

(3) Students seeking accommodations for the spring semester of 1996 must provide LDSS with a high school transcript, a college transcript, and a current BU course schedule including course numbers, course descriptions, and the names and addresses of the professors.

Brinckerhoff distributed the letter to students just prior to final examinations for the fall semester of 1995. He did not forward a copy of the letter to Westling for his approval; nor did he check that it accurately conveyed Westling's policy directives. When Westling learned of the letter, he requested that Norm Johnson issue a statement retracting some of the requirements for accommodation that Brinckerhoff had articulated.

On December 22, 1995, approximately three weeks after Brinckerhoff's correspondence, Johnson sent a letter to the learning-disabled students at BU. Johnson's letter notified students that the university was deferring the deadline for submitting current documentation from January 8, 1996—the date set forth by Brinckerhoff—until August 31, 1996. Moreover, it sought "to correct a significant error in Dr. Brinckerhoff's letter" regarding the need for reevaluation. Although Brinckerhoff's letter stated that students with old documentation must be retested if they were to continue to receive assistance from LDSS, Johnson maintained (without explanation) that "[n]o such reevaluation will be necessary in order to continue receiving services from Learning Disability Support Services." Johnson also expressed his "regret" that students "were notified of these proposed changes during the examination period," and he apologized "for any inconvenience."

Throughout the first semester of the 1995—1996 school year, learning-disabled students, parents and professors received mixed and inconsistent messages from university administrators regarding the requirements for seeking and receiving academic accommodations at BU. As a result of the confusing and chaotic climate occasioned by BU's new accommodations policy, there was a substantial reduction in the number of students with self-identified learning disabilities who have attended BU since 1995. Whereas 94 students with self-proclaimed learning disabilities enrolled at BU in 1994, the number of such students had dropped to 71 by the 1996—1997 academic year.

VI. *Resignation, Reorganization, and Restructure*

Early in 1996, several members of the disability services office resigned, including Brinckerhoff and Opperman, and the Provost's office became the primary decision maker in determining whether a student was to receive an accommodation for a learning disability. In evaluating requests for reasonable accommodations, the Provost's office consulted with specialists like neuropsychologists or the remaining staff at LDSS. With the LDSS office virtually unstaffed, the university undertook to restructure the entire disability services department. Instead of having a self-contained unit within the disability services office to evaluate the accommodations requests of learning-disabled students, the new Office of Disability Services ("DS") was structured to manage accommodations for all students with disabilities, whether physical, mental, or in learning. The reconfigured DS staff consisted of a full-time director, an assistant director, a clinical director of learning disability support services, an LD coordinator, a coordinator of interpreter services, and two senior staff assistants. The office was also designed to employ several part-time learning specialists, tutors, interpreters, readers, and notetakers.

On March 25, 1996, BU hired Allan Macurdy, an adjunct assistant professor of law, as the new DS director. Macurdy, a quadriplegic, is a specialist in laws affecting the physically disabled. Soon after his arrival, in the absence of a complete staff, Macurdy personally undertook to review the accommodation requests of students with learning disabilities, even though the student files were

in complete disarray (many were inaccurate, incomplete or missing), and neither he nor the other newly-hired DS staff members had any expertise in diagnosing learning disabilities or in fashioning appropriate accommodations.[10] Between March of 1996 and January of 1997, Macurdy's office reviewed over 80 student files and made recommendations about the requested accommodations. During this time, BU also retained neuropsychologists with expertise in learning disabilities to review student files and make accommodations determinations with regard to learning-disabled students. All recommendations for accommodations made by the DS staff were forwarded to the Provost's office for approval.

By May 31, 1996, the Office of the Provost at BU had reviewed DS recommendations for 77 learning-disabled students. Students whose requests for accommodation were denied by Westling's office were often told to contact the Provost in order to seek reconsideration. However, because there was no established appeal procedure, students and their parents were occasionally not given any information at all regarding further review. As a matter of informal, unwritten policy, the only appeal from the denial of a requested accommodation was to seek reconsideration by the Provost. Students with physical disabilities grieved any denials through the Section 504 procedure handled by the Office of the Dean of Students.

VII. *Present Accommodations Process*

In January of 1997, BU hired Dr. Lorraine Wolf as the new clinical director for learning disability support services. Before being appointed, Wolf was a practicing neuropsychologist and an assistant professor of Clinical Psychology at Columbia University. Wolf had also done consulting work for BU since November of 1996.

From early 1997 until the present, Wolf's responsibilities as clinical director have included reviewing the documentation submitted by learning-disabled students and making recommendations regarding the accommodations that should be provided to a student on the basis of a learning disability. Although Wolf officially began the clinical director's task of reviewing student files in January, she did so remotely—from her office in New York City[11]—until late May, when she completed her maternity leave and moved to Boston to begin her full-time, in-house position.

At present, students with documented learning disabilities at BU may request accommodations such as reduced course loads, use of special computer technology, books on tape, extra time on examinations in a distraction-free environment, and note takers. BU's eligibility requirements for receiving such accommodations are summarized as follows:

(1) Learning-disabled students must be tested for a learning disorder by a physician, licensed clinical psychologist or a person with a doctorate degree in neuropsychology, educational or child psychology, or another appropriate specialty. The evaluator must have at least three year's experience in diagnosing learning disorders.

(2) Documentation must be current, as it is recognized by BU for only three years after the date of the evaluation. A learning-disabled student whose documentation is too old at the time he matriculates, or whose documentation "expires" during his time at BU, must be reevaluated (including retesting). If retesting is deemed unnecessary by the student's evaluator, the evaluator is

---

10. BU hired Carrie Lewis, a former executive assistant to the superintendent in Chelsea, Massachusetts, as the assistant director of disability services, and Judith Zafft, a former high school special education teacher, as the coordinator of learning disability services. The new DS staff was "hand-picked" by Westling, and Zafft had expressed to Westling her belief that "there is too much abuse in the granting of accommodations" prior to her consideration for the job.

11. Members of the DS staff sent student applications and documentation from Boston to New York by express mail. Wolf would review the student files, make her recommendations, and then send the materials back to BU. Dr. Wolf reviewed 38 files in this manner between January and mid-April.

required to fill in a form explaining why it is not "medically necessary."

The procedure for requesting and receiving an accommodation for a learning disability at BU is as follows. First, a student requesting accommodations submits an application to the DS office.[12] Wolf reviews the submitted documentation and makes a determination regarding the accommodations that are appropriate for the student. Then, the student's file and Wolf's recommendations are forwarded to the President's Office. Klafter reviews each student's documentation for consistency and, when necessary, discusses with university faculty and administrators how the recommended accommodation will affect a particular academic program or course of study. If the President's Office accepts Wolf's accommodation recommendations, as is mostly the case, the DS office notifies the student. Generally within two weeks of the request, the DS office also generates accommodations letters to be given to the affected faculty members.

As of April 1997, the President's office endorsed most of Wolf's recommendations for a grant or denial of a request for accommodations due to a learning disability. In several situations, Westling consulted with Wolf and with the relevant department head and denied a requested accommodation where he believed the request was inconsistent with academic standards. For example, Westling rejected a request for a notetaker by a learning-disabled ROTC student in a course on manufacturing engineering; however, he authorized the student's use of a tape-recorder. In other situations, despite initial hesitation, Westling agreed to a notetaker for a student studying social work and a calculator for a student in a math course. In the Wolf era, the interaction between the President's Office and DS in evaluating student files focuses on determining which modifications of academic requirements are appropriate for a given learning-disabled student, rather than on ascertaining the nature and extent of a student's learning disability.

BU admits that it has yet to articulate a single, specific process for students to follow if their request for accommodation is denied. In this litigation, the university takes the position that either the appeal to President Westling or the university's Section 504 grievance procedure is adequate to address student concerns.

## VIII. *Impact on Individual Students*

The experiences of several of the plaintiffs in attempting to secure accommodations from BU under the new accommodations policy are summarized as follows.[13]

### A. *Elizabeth Guckenberger*

Elizabeth Guckenberger was diagnosed with dyslexia in 1990 during her freshman year at Carleton College. As an undergraduate she received double time on her examinations, exemptions from her language requirements, and the option of a notetaker. Based on her 1990 diagnosis, Guckenberger also received testing accommodations for the LSAT. With these accommodations, Guckenberger was successful enough academically to be accepted to BU's School of Law in the spring of 1993.

Guckenberger enrolled at BU Law School in the fall of 1994. She chose BU in part because her letters of acceptance specifically acknowledged her learning disorder and stated that the university would accommodate

---

12. The application form has two parts. Part I requires the student to provide a specific description of the requested accommodations, a list of the classes for which accommodations are requested, a copy of the student's course registration, and transcripts from high school and any post-secondary school course of study. Part II is a form to be completed by the student's evaluator. In sum, the form requires a specific diagnosis, test results, and specific recommendations for accommodation. BU requires that the students evaluation be conducted by a physician, licensed clinical psychologist, or a qualified Ph.D with at least three years experience in diagnosing learning disorders. A student who seeks academic accommodations for semester-long courses must submit Part I of the application form (without the transcripts) at the beginning of each semester.

13. The Court considers only the claims for damages of those named plaintiffs whose testimony was presented in person or was admitted by affidavit or deposition transcript during the two-week bench trial.

her "to the full extent required by law." Guckenberger also spoke to Brinckerhoff before she matriculated about the services provided by LDSS.

To document her disability as required, Guckenberger submitted to LDSS the evaluation that had been prepared in 1990, when she was first diagnosed, by a learning disabilities consultant from the Dyslexia Institute of Minnesota. Based on this documentation, LDSS determined that Guckenberger "has problems with both visual and auditory processing," and recommended to the Dean of Academic Affairs at the Law School that she be given notetaking assistance, a reduced course load, priority registration for a section with afternoon classes, and time and one half on exams in a quiet, distraction-free room. During her first year of law school, Guckenberger received these accommodations without incident.

Early in November of 1995, during the first semester of her second year, Guckenberger went to LDSS to verify that she would be receiving accommodations for her fall examinations. Brinckerhoff informed her that, pursuant to the new accommodations policy, she would have to be completely retested for dyslexia before exams began (within the ensuing three weeks) in order to receive accommodations. Stunned, Guckenberger asked for the names of testing specialists who would be acceptable to the school. Brinckerhoff told her that no such list was available.

Confused and upset, Guckenberger arranged a meeting with Kip Opperman, BU's Director of Disability Services. Opperman told her that she definitely needed to be retested due to the insufficiency of her documentation; however, he could not provide her with a formal statement of the new policy or with the names of any doctors approved by LDSS. Guckenberger then met with Law School Associate Dean Beerman, who told her that accommodations would be made for her impending examinations as long as she made an effort to comply with the new accommodations policy. Over the next few days, Guckenberger contacted two qualified LD specialists; however, neither doctor could evaluate her until the middle of January. Guckenberger notified BU administrators Opperman and Beerman that a reevaluation before the end of the semester would not be possible.

In early December of 1995, Guckenberger received Brinckerhoff's letter stating that she had to be retested by January 8, 1996. At the end of the month, she received Norman Johnson's letter deferring the retesting deadline until August of the following year.

In the months that followed, Guckenberger and a few of her colleagues met with Klafter to discuss BU's new accommodations policy for students with learning disabilities. Klafter expressed the concern about students who might be "faking" a learning disorder to procure special accommodations. At some point, he referred to non-licensed, learning-disabilities specialists as "snake oil salesmen." Klafter told her that it was significant that mostly "rich kids" had diagnoses of learning disorders and expressed concern that the diagnoses were not genuine. Then, without clarification, Klafter told the group that not all learning-disabled students with insufficient documentation needed to be completely retested under BU's new policy.

On April 10, 1996, Guckenberger spoke with Carolyn Suissman, an LDSS coordinator, and was told that she must be retested in order to comply with BU's new requirements. Although she was unsure of whether retesting actually was required, to avoid future problems Guckenberger arranged for a complete reevaluation by a licensed clinical psychologist beginning in late April of 1996. The retesting process spanned four days and cost over $800.00. The test results confirmed that Guckenberger had dyslexia, and the psychologist, who had been recommended by BU, suggested the same accommodations that Guckenberger had received during her first and second years of law school.

Guckenberger received all of the accommodations that she had requested throughout her time at BU Law School, including being allowed to take one class less per semester than the average law student. She also received time and one-half on her examinations, a distraction reduced environment in

which to take examinations, and the use of a notetaker. Nevertheless, Guckenberger, who has a history of depression, suffered anxiety during the 1995—1996 school year after her accommodations were threatened as a result of BU's new documentation requirements. During the spring semester of 1996, she organized the Law Disability Caucus, a student group that is a co-plaintiff in this class action, to confront the university about its treatment of learning-disabled students seeking reasonable accommodation.

Guckenberger has apparently rebounded well. She is currently completing a joint-degree program, and is working for the office of the United States Attorney in Boston this summer.

## B. Avery LaBrecque

A school psychologist identified Avery LaBrecque's language-based learning disability when LaBrecque was in the first grade. The disorder, which impairs her ability to process, memorize, and understand the mechanics of languages, prevented LaBrecque from being successful at reading, mathematics, and spelling. At a very early age, she began a twelve-year odyssey of private tutoring.

LaBrecque took her first foreign language class in the ninth grade. Because of her extremely low performance, her Latin teacher recommended that she be exempted from the high school's language requirement, and be formally tested for a learning disability. In 1990, a neuropsychologist's evaluation revealed that LaBrecque had a language-based learning disorder as well as Attention Deficit Hyperactivity Disorder ("ADHD").

In high school, LaBrecque was placed in a special education program that met once a day. In her regular courses, she received accommodations such as extra time on examinations and a separate testing room. Although she was completely exempted from the foreign language requirement, she nonetheless continued to receive private tutoring for her regular classes.

In 1992, LaBrecque attended BU's "Taste of College" summer program for high school students with learning disorders. During the program, Loring Brinckerhoff informed her that, even though she did not take foreign language in high school, she was still eligible for admission into a competitive university such as BU. Brinckerhoff also discussed the option of substituting cultural courses for BU's foreign language requirement. At the conclusion of the summer program, LaBrecque was retested by a psychoeducational clinician and a school psychologist at the recommendation of support service administrators at LDSS. The specialists confirmed that LaBrecque had a language-based learning disorder and ADHD.

LaBrecque entered the College of General Studies ("CGS") at BU as a freshman in 1993.[14] For her first two years, she received double time on exams in a separate room, a spellchecker for exams, taped lectures, and a note taker. In the fall of 1995, she transferred to the College of Liberal Arts and four semesters of foreign language became a required part of her course of study. Seeking a course substitution through LDSS, LaBrecque submitted an application to LDSS and took a foreign language aptitude test in August of 1995 to determine if she was eligible for a course substitution. When LaBrecque contacted LDSS for the results in September, she was told that her application for accommodations had been forwarded to the Provost's office, along with LDSS's recommendation that she receive a course substitution in lieu of the foreign language requirement.

In October of 1995, LaBrecque was notified that her request for a course substitution for the required four semesters of foreign language was denied. Dismayed that she was not allowed the course substitution in spite of LDSS's recommendation that she receive one, and upset that the denial occurred so late in the semester, LaBrecque took steps to appeal the university's decision. In early November, her father contacted the Provost's Office, and in response to his expressed concern, Westling reconsidered her documentation. In a letter dated November 10, 1995, Westling approved an exclusion from the *written* portion of LaBrecque's for-

14. The College of General Studies at BU provides a two-year course of study.

eign language courses. The letter stated that the basis for Westling's determination was LaBrecque's evaluator's opinion that, although "Avery is at risk for foreign language learning," "[i]f it is possible for her to deal with foreign language learning only [sic] an oral level, that may be tried."

In subsequent meetings with Professor Robert Richardson of the Department of Modern Foreign Languages and Literatures at BU, LaBrecque was told that Swahili was an oral-based language and that Westling had agreed that she should enroll in Swahili because it had no written-component. However, when LaBrecque contacted the Professor of Swahili, John Hutchinson, he informed her that Swahili was indeed a written language, and that her written foreign language abilities would be tested in the class along with her oral language skills.

Devastated by the BU's refusal to accommodate adequately her fully-documented foreign-language learning disorder, LaBrecque decided to transfer to a different college. In May of 1996, during what would have been the end of her junior year at BU, LaBrecque enrolled at Florida State University ("FSU"). LaBrecque withdrew from FSU that fall. Since returning to Boston late in 1996, LaBrecque has sought treatment from both a psychiatrist and a psychologist, and she is still dealing with loss of self-esteem and depression.

### C. Benjamin Freedman

Benjamin Freedman was diagnosed with dyslexia as a freshman in high school. Based on his 1989 diagnosis, his high school provided him with a number of accommodations including extra time on exams, a separate examination room, and oral administration of certain tests. As a high school senior, he was retested for dyslexia, and his evaluator, who had a masters in education, found no changes in his learning disability.

Freedman enrolled at BU as a freshman in 1993. For his first two years in college, Freedman received extended time on his exams, use of a note taker and word processor, and oral examinations for certain courses— accommodations that he learned about prior to deciding to attend BU through independent research and a conversation with a BU admissions representative.

In December of 1995, Freedman received Brinckerhoff's letter regarding the changes in LDSS's accommodations policy. Confused and angered, Freedman contacted Brinckerhoff and Dean David Mansfield, Assistant Dean of Students, about the new policy.

At around the same time, Freedman began to hear and read about the comments that Westling had been making about the learning disabilities movement. Early in 1996, Freedman read one of Westling's speeches, and was upset by its rhetorical reference to learning disorders as "genetic catastrophes." Freedman appeared with Westling on the television show "Good Morning America" and expressed his belief that Westling's derogatory comments discriminated against BU students with learning disabilities.

In the fall of 1996, at the beginning of his senior year of college, Freedman transferred to CW Post, Long Island University in New York, near to his home. At trial, Freedman testified that the tuition at CW Post is approximately half of what he had been paying to attend BU.

### D. Jill Cutler

Jill Cutler, now a junior majoring in Early Childhood Education at BU's School of Education, was first diagnosed with a learning disability when she was in the sixth grade. Evaluations that were conducted when she was in the seventh grade, and again when she was a freshman and a junior in high school, revealed that she has a learning disorder that specifically affects auditory processing, sequencing, and reading comprehension. As a result, throughout high school, Cutler received tutors, untimed examinations, and modified classes. She was also given extended time on her college entrance examinations.

Cutler enrolled at BU's College of General Studies in the fall of 1994, and submitted to LDSS a copy of an evaluation conducted in 1993 in support of her request for special accommodations for her learning disability. During her first two years at BU, BU allowed Cutler to have extended time on her

examinations and to take the exams in a distraction-free room.

Cutler first became aware of BU's new accommodations policy when her father read about it in the *New York Times* in February of 1996. Cutler met with LDSS representative Carolyn Suissman before she left Boston for the summer break. Suissman told Cutler that she needed to be completely retested in order to comply with BU's new requirements. Cutler was also informed that she needed to provide the university with a copy of her high school transcript.

In June of 1996, Cutler underwent what she describes as "the humiliating" and "traumatic" ordeal of being retested for a learning disability. She was "frantic" about the retesting because it reinforced her belief that she was not "normal." Over a period of three to four hours and at a total cost of $650.00, a neuropsychologist found that Cutler's learning disorder had remained unchanged since her last evaluation in 1993. The evaluator recommended that Cutler be allowed to retain the accommodations she received during her first two years at BU for the remainder of her education.

E. *Scott Greeley*

In 1984, Scott Greeley's first grade teacher discovered that he had a problem with sequential processing, i.e., the ability to transfer concepts into a verbal or written form. An assessment by the school psychologist confirmed that Greeley had a learning disorder. In 1991, when Greeley was fourteen, he was formally evaluated by an educational therapist. The therapist tested Greeley and determined that he had an audio-visual learning processing deficit that limits his ability to process basic information quickly.

Throughout high school, Greeley received special accommodations from the school district including extra time to complete tests and assignments. He successfully completed four years of foreign language courses in high school. With the aid of accommodations such as extra time, Greeley performed well academically (even in honors classes), and he received a score of 1210 on the standardized Scholastic Aptitude Test. In 1994, Greeley was re-evaluated by the same educational therapist who conducted his 1991 assessment in order to document further his disability.

In the fall of 1994, during his senior year in high school, Greeley wrote to BU requesting information about university programs for students with learning disabilities. After learning about LDSS and the various accommodations available for learning-disabled students, Greeley decided to apply to BU.[15] BU not only accepted Greeley, the university also gave him a four-year financial scholarship premised on his maintenance of a 3.0 grade point average.

Early in the spring of 1995, Greeley and his father flew to Boston to visit BU and to investigate further the support structure for students with learning disabilities. Greeley and his father met with LDSS representative Carolyn Suissman, who explained the various types of accommodations available and stated that Greeley should have "no problem" in getting accommodations from the university. Greeley got an even better sense of the university's requirements by attending BU's transition summer program for learning-disabled students.

Greeley enrolled as a freshman in BU's College of Arts and Sciences in the fall of 1995. Before classes began, Greeley requested accommodations such as time and one half on examinations, a note taker, access to books on tape, and the opportunity to clarify test questions.[16] Once the semester began, and Greeley still had not heard from LDSS regarding his requested accommodations, he began to contact the LDSS office regularly. At first, he was told that LDSS was going through changes, that the accommodations letters might have to be revised, and that he should return within the week. One week turned into months. Greeley kept returning to the LDSS office to check on the

---

**15.** Greeley also applied to (and was accepted at) the University of Illinois, the University of California—Davis, California Polytech, Sonoma State, and the University of Puget Sound.

**16.** This was not a standard accommodation and was suggested by an LDSS staff member.

status of his accommodations and was told time and time again to come back later.

On November 27, 1995, after enduring nearly an entire semester without the requested classroom accommodations, Greeley was told by an LDSS representative that he was ineligible for accommodations under the new guidelines. When he asked for a copy of the guidelines, he was told that none existed. Without LDSS accommodations letters, Greeley had to approach each of his professors, explain his situation, and ask for extra time on his exams. For his first semester at BU, LDSS did not authorize the in-class accommodations that Greeley had requested.

On or about December 3, 1995, Greeley received a letter addressed to him from Loring Brinckerhoff informing him that his request to clarify test questions was not supported by the evaluation that he had submitted as documentation of his learning disability. The letter also indicated that Greeley's evaluator needed to be a physician, clinical psychologist, licensed psychologist or neuropsychologist and must "have a record of reputable practice" in order to be acceptable to the university. At about this time, Greeley also received the form letter from Brinckerhoff describing the changes in LDSS policy.

Early in 1996, prior to the start of the spring semester, Greeley sought clarification from LDSS regarding his eligibility for accommodations in light of the new policy. He was told that he needed to be retested, even though his original documentation had been accepted by the BU summer program. At LDSS's suggestion, Greeley had his test results reviewed by a licensed clinical psychologist who wrote BU a letter confirming Greeley's disability and indicating that his accommodations requests were reasonable. At some point during the spring semester, Greeley was told that the psychologist's report would be valid for that semester only, and that he would have to be retested to receive accommodations for the remainder of his time at BU. At the end of February of 1996, Greeley received his first LDSS approval and accommodations letters.

Greeley suffered extreme stress from the fall of 1995 until February of 1996 during his attempts to get BU to honor his documentation and to provide him with accommodations for his learning disability. As a physical manifestation of his anxiety, Greeley contracted severe acne which he had to treat with a medication that caused him to be drowsy and to gain weight. During his first semester at BU, Greeley's grade point average was a mere 1.67. As a result, he lost his promised academic scholarship and his federal subsidized loans. The increased financial hardship, in turn, contributed to his feelings of stress, low self-esteem, and depression. Although Greeley received accommodations of a notetaker and time-and-a-half on examinations in the fall of 1996, at the beginning of his sophomore year, he still finished the semester with a poor grade point average.

### F. Jordan Nodelman

Jordan Nodelman first became aware of his attention problem in 1989, when he was in the eighth grade. At his mother's request, a clinical psychologist administered a battery of tests and discovered that Nodelman exhibited "all the features of a moderate attention deficit disorder ('ADD') with mental rather than physical restlessness." In the spring of 1993, when Nodelman was in the eleventh grade, he was evaluated again by an individual with a doctorate in education. The evaluator's diagnosis, which was consistent with the results of an additional review that she conducted nine months later, was that Nodelman had "significant learning discrepancies" that "appear[ ] to be the result of an attention deficit disorder." Nodelman used this evaluation in order to qualify for such accommodations as an untimed administration of the Scholastic Aptitude Test in a distraction-reduced environment.

During the summer of 1993, between his junior and senior years of preparatory school, Nodelman attended BU's summer transition program for high school students with learning disorders. As a result of the program, Nodelman not only learned about college-level academic requirements, but was also informed that the university provided accommodations for ADD. Based on his experience in the summer program and the

recommendation of his evaluator, Nodelman decided to apply to BU.

Nodelman matriculated at BU's College of General Studies ("CGS") in the fall of 1994. At the beginning of his freshman year, Nodelman talked with Loring Brinckerhoff about the accommodations that he would need. On the basis of his documentation,[17] Nodelman received all of the accommodations that he asked for including time and one-half on examinations, a distraction-free examination room, and use of a calculator (where warranted) for his first two years at BU. Nodelman performed well with the accommodations he received, making the Dean's List at CGS every semester during his freshman and sophomore years.

Nodelman first became aware of the changes in LDSS policy in 1995, at the end of the first semester of his sophomore year. In early December, he received the letter from Brinckerhoff describing the new requirements, and in late December he received the letter from Dean Johnson modifying Brinckerhoff's correspondence. Concerned about the seemingly conflicting statements of policy, and confused about the effect of the new procedure on his ability to receive accommodations, Nodelman called several LDSS administrators, including Brinckerhoff, for clarification. Brinckerhoff told Nodelman that his documentation was sufficient to support accommodations for his pending examinations.

Early in 1996, Nodelman went to LDSS to apply for accommodations for the spring semester. A few weeks later, Nodelman received accommodations letters from LDSS addressed to his professors recommending the accommodations that he had requested.

Just prior to summer vacation at the end of his sophomore year, Nodelman met with LDSS representative Manju Banerjee to make sure that his documentation fulfilled university requirements so that he could re-

ceive accommodations when he returned in the fall. Banerjee told Nodelman that his LD file, which contained copies of his evaluations and test results, was missing and that he would have to supply BU with new information. During the summer of 1996, he sent new copies of the evaluations that had been in his file to the Disability Services Office at the request of new DS director, Allan Macurdy.

Still confused about whether his documentation was adequate under the new accommodations policy, Nodelman spoke with Macurdy during the summer of 1996 to get clarification on the acceptability of his evaluations. Specifically, Nodelman was worried that his evaluator, who had a doctorate in education, would be deemed unqualified under the then-existing version of BU's new accommodations policy.[18] Macurdy told Nodelman that, in lieu of being completely retested, he could get the clinical psychologist who conducted his eighth-grade evaluation to review the educational doctorate's report and write a letter stating that the report was adequate. At a cost of $150.00, Nodelman's mother commissioned the psychologist to prepare such a letter.

Nodelman has been successful both academically and socially at BU. In January of 1997, Nodelman left for France to participate in BU's semester-abroad language program.

### G. Catherine Hays Miller

Catherine Hays Miller, who testified at trial but is not a named plaintiff in this action, was diagnosed with ADD in the second grade. She also has dyslexia, particularly in foreign language, which was discovered when she flunked one year of Spanish in her sophomore year of high school. Miller enrolled at BU in 1995 because it was reported to have one of the best learning disabilities programs in the country, and because she

---

**17.** To be eligible for accommodation during the summer transition program, Nodelman had submitted to LDSS the 1989 evaluation conducted by the clinical psychologist and the two evaluations done in 1993 and 1994 by the Ed.D.

**18.** During the 1996–1997 school year, BU amended its policy regarding the credentials of

evaluators in order to allow testing done not only by medical doctors and licensed or clinical psychologists, but also by individuals with doctorates in neuropsychology, educational or child psychology, or "in another appropriate specialty."

had been told by BU representatives that BU made course substitutions available for students with documented foreign language learning problems. However, when Miller sought such an exemption, BU refused to allow the requested substitution. Miller took first semester Spanish as required, and with a huge amount of effort, she received a "B" in the class.

Eventually, Miller and her parents convinced Westling to reconsider her request to be exempted from BU's foreign language requirement. After reviewing a report that was completed by a licensed clinical psychologist with a doctorate stating that "Hays appears to have difficulties in the area of auditory processing," Westling approved a waiver of the *verbal* portion of the foreign language requirement. When the evaluator supplemented his report with a letter clarifying that "Hays' disability will in fact greatly impair her ability to learn a foreign language either verbally or through written instructional methods," Westling declared that "[t]he clinical record presented in support of Hays' claim [for exemption] is, at best contradictory," and that "as such, it is insufficient to substantiate the assertion that she is incapable of learning a foreign language." BU continues to require Miller to complete four semesters of a foreign language program emphasizing written instruction.

## IX. *Learning Disorders, ADD, and ADHD—A Primer*

Seven expert witnesses testified at trial about the nature, diagnosis, and accommodation of the conditions known as learning disorders, ADD, and ADHD. In order of appearance, the expert witnesses were: (1) Dean Robert Shaw, Associate Dean and learning disabilities administrator at Brown University; (2) Peter Blanck, Professor of

Law, Preventive Medicine, and Psychology at the University of Iowa; (3) Sally Shaywitz, M.D., Professor of Pediatrics at Yale University and Co–Director of the NIH–Yale Center from the Study of Learning and Attention; (4) George Hynd, Research Professor of Special Education and Psychology at the University of Georgia and Editor–in–Chief of the *Journal of Learning Disabilities*; (5) Rachel Klein, Professor of Clinical Psychology at Columbia University's College of Physicians & Surgeons and Director of Clinical Psychology at the New York State Psychiatric Institute; (6) Linda Seigel, Professor of Educational Psychology and Special Education at the University of British Columbia in Vancouver; and (7) Richard Sparks, Associate Professor of Education at the College of Mount St. Joseph.[19]

### A. *The Disabilities*

#### 1. *Dyslexia*

Dyslexia has been traditionally defined as an "unexpected difficulty learning to read despite intelligence, motivation and education."[20] As Professor Seigel pointed out, both Agatha Christie and William Butler Yeats had learning disabilities which created problems in spelling.

Dr. Sally E. Shaywitz, co-director of the Yale Center for the Study of Learning and Attention, and Professor of Pediatrics at the Yale University School of Medicine, describes the disorder as a neurobiological condition that "interfere[s] with a normally intelligent [person's] ability to acquire speech, reading, or other cognitive skills." *Id.* Dyslexia, the most common learning disorder, is a reading disability that is the result of a phonological processing deficit, or "decoding" problem.[21] A dyslexic's ability to break

19. The parties also submitted transcripts of the deposition testimony of three additional experts: John J. Ratey, M.D., a clinical assistant professor at Harvard Medical School, Michael Gordon, a professor in the Department of Psychiatry at the State University of New York Health Science Center, and Kenneth Kavale, a professor of Special Education at the University of Iowa.

20. Sally E. Shaywitz, Dyslexia, *Scientific American* (November, 1996).

21. The human language system consists of several hierarchical modules or components. The upper levels of the hierarchy are concerned with higher-order thought processes such as semantics, syntax, discourse, and overall comprehension. The lowest level contains the phonological module, the component that enables a reader to break down a word into its basic phonetic units so that it can be identified. The English language has 44 phonemes, defined as the smallest

down written words into their basic linguistic units is impaired. However, her higher-level cognitive comprehension abilities—vocabulary, reasoning, concept formation, and general intelligence—may remain intact despite the deficit in phonological processing. About 80 percent of people with learning disabilities have dyslexia. If an individual has a learning disability that makes phonological processing difficult, that individual will have a difficulty with any aspect of learning that involves language, including the acquisition of proficiency in a foreign language.

2. Attention Deficit Disorder ("ADD")/Attention *Deficit Hyperactivity Disorder ("ADHD")*

ADD and ADHD, as described in volume four of the *Diagnostical Statistical Manual* of the American Psychiatric Association ("DSM–IV"), have the following diagnostic feature: "a persistent pattern of inattention and/or hyperactivity-impulsivity that is more frequent and severe than is typically observed in individuals at a comparable level of development." An individual who has the chronic disorder classified as ADHD has neurological problems that involve inattention, hyperactivity, and impulsivity. ADD, which is a subtype of ADHD, is manifest only as a problem with attention. The DSM–IV's diagnostic criteria require that some hyperactive, impulsive or inattentive symptoms that caused impairment were present before age 7 years, and that the symptoms are not better accounted for by another mental disorder. Although ADD and ADHD may interfere with a student's ability to perform effectively, they are not technically learning disabilities, in that the person's ability to acquire basic academic skills is not compromised.

Approximately three percent of the young adult population demonstrates symptoms of ADD or ADHD. According to Professor Rachel Klein, who has performed a longitudinal study, ADD and ADHD have a relatively high rate of permanent, spontaneous remission as a person moves from adolescence into adulthood. She concluded that between ages 16 and 18, 40 to 50 percent of students get

better, and another 30 to 40 percent improve between the ages of 18 and 20. The study indicates that, although approximately 70 percent of individuals diagnosed with some form of ADHD as children still have symptoms by age 16, once those individuals reach their 30's, only some ten percent are still symptomatic. Another study shows that 40 to 60 percent of students with ADD continue to exhibit symptoms into adulthood. Klein also testified that "there are a fair number of instances in which there is considerable question about the accuracy of the diagnosis of ADHD in college-age students."

According to Dr. John Ratey, M.D., of Harvard Medical School, certain medical conditions may mask or simulate ADD. For example, hyperthyroidism also has symptoms like hyperactivity and inattentiveness. Other medical conditions produce symptoms of inattentiveness like brain damage, substance abuse, depression and hormonal problems. Because the vast majority of individuals with ADHD and ADD respond well to medications, psychopharmacological treatment enables seventy percent of individuals to function in the range of normal. According to Dr. Ratey, people that have ADD are in an ongoing process of medical evaluation.

B. *The Diagnoses*

Over the last decade, there has been a steady growth in the number of students identifying themselves as learning disabled, but this growth is now flattening out. Some experts attribute this growth to: (1) the enactment of the Individuals with Disabilities Education Act in 1975, which requires public school districts to identify students with learning disabilities; (2) the increasing awareness of the existence of learning disabilities among educators, researchers and the public at large; and (3) the passage of the Americans with Disabilities Act. The number of students with learning disabilities at colleges and universities hovers at about two per cent.

The DSM–IV now has a section on learning disorders which include reading disorders, mathematics disorders, disorder of

meaningful segment of language. For example, the word "cat" has three phonemes: C–A–T.

written expression, and learning disorders not otherwise specified. It states that the prevalence of reading disorders (which accounts for 80 percent of all learning disorders, alone or in combination with other disorders) is estimated at approximately 4 percent of school-age children. The DSM–IV provides: "Learning disorders are diagnosed when the individual's achievement on individually administered, standardized tests in reading, mathematics, or written expression is substantially below that expected for age, schooling, and level of intelligence." The American Psychiatric Association defines "substantially below" as a discrepancy of more than 2 standard deviations between achievement and I.Q. Although some experts are beginning to maintain that I.Q. testing is not essential to diagnosing a learning disability (and is sometimes misleading), I.Q. tests are used in twenty-nine states and two Canadian provinces in evaluating the learning disabled, and many universities still require the submission of I.Q. test results. In addition, learning disorders are diagnosed through a battery of standardized tests such as Wechster Individual Achievement Test ("WIAT"), the Wide Range Achievement Test–Revised ("WRAT–R"), and the Woodcock Johnson tests of Cognitive Ability.

By contrast, ADD and ADHD diagnoses involve a clinical evaluation and can include psychological testing that costs up to $1,200. Evaluators make assessments on the individual that take into account behavioral reports from sources such as the person himself, his parents, teachers, spouses, and friends. As a result, ADD/ADHD is both underdiagnosed and overdiagnosed, and normal behavioral problems in children are sometimes misdiagnosed as ADD or ADHD, especially in young boys.

### C. *Possibility for Change*

Once diagnosed, learning disorders and ADD/ADHD have significantly different possibilities of change or remission. Although ADD/ADHD have a high rate of remission as a person enters adulthood, specific learning disorders do not disappear over time. Some individuals with language-based learning disorders such as dyslexia may learn to overcome their processing problems; however, reading can occur only "at a great cost in time." [22] Other dyslexics may never learn to decode, but may accomplish reading by struggling to recognize words in context. As opposed to individuals with ADHD, after a person with a learning disorder reaches adulthood (age 18), there is no significant change in his cognitive abilities.

### D. *Professional Guidelines*

An ad hoc committee of the Association for Higher Education and Disabilities ("AHEAD") consists of an impressive array of experts in post-secondary education,[23] has issued "Guidelines for Documentation of a Specific Learning Disability." The guidelines provide standard criteria for post-secondary personnel to use in verifying learning disabilities in order to: (1) provide "a conservative—though flexible—approach to minimize the risk of over-diagnosis"; (2) offer recommendations on how to determine the appropriateness of accommodation requests made by individuals with learning disabilities; and (3) provide guidance in "determining the necessary qualifications of the evaluator and his/her role in the process."

With respect to documentation, AHEAD states that a complete set of aptitude and achievement test results are required. Actual test scores must be provided because the

**22.** Sally Shaywitz, Jack Fletcher, and Bennett Shaywitz, *A conceptual model and definition of dyslexia: findings emerging from the Connecticut Longitudinal Study*, in Language, Learning and Behavior Disorders 199 (Joseph H. Beichtman, et al., eds.).

**23.** The following individuals are members of the AHEAD Ad Hoc Committee on Learning Disabilities: Loring Brinckerhoff, Chair, Higher Education Consultant, Learning Outcomes of Greater Boston; the Manager of the Law School Admissions Test; the Director of the University of Memphis Student Academic Support Services; Test Accommodation Specialist, National Board of Medical Examiners; Director, University of Connecticut Program for College Students with Learning Disabilities; Chairperson, Committee for People with Disabilities, Educational Testing Service; Coordinator, Academic Skills Center, Dartmouth College; Director, Student Disabilities Resource Center, Harvard University.

"assessment must show evidence of discrepancies and intra-individual differences." In addition, the guidelines provide:

**B. Testing must be current.**

In most cases, this means testing that has been conducted within the past three years. Because the provision of all reasonable accommodations and services is based upon assessment of the current impact of the student's disabilities on his/her academic performance, it is in a student's best interest to provide recent and appropriate documentation. In the case of adults tested after age 21, testing within a five-year period can be accepted.

With respect to the qualifications of the professional conducting the evaluation, the guidelines state that "[t]he following professionals would generally be considered qualified to evaluate specific learning disabilities provided that they have comprehensive training in learning disabilities: clinical or educational psychologists, neuropsychologists, learning disabilities specialists, and medical doctors known to specialize in specific learning disability conditions."

## CONCLUSIONS OF LAW

I. *Discrimination Claims under the ADA and Section 504*

The plaintiff class claims that BU discriminates against students with learning disabilities in violation of the Americans with Disabilities Act ("ADA"), and the Rehabilitation Act of 1973 ("Section 504").

A. *The Laws*

■ In relevant part, Title III of the ADA provides:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns,

leases (or leases to) or operates a public accommodation.

42 U.S.C.A. § 12182(a) (West Supp.1995). The Rehabilitation Act of 1973 ("Section 504"), the venerable ancestor of the ADA makes a similar guarantee:

No otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefit of, or be subjected to discrimination under any program or activity receiving Federal financial assistance....

29 U.S.C.A. § 794(a) (West Supp.1997), *as amended by* Pub.L. No. 102–569, § 102(p)(32) (1992) (changing "handicap" to "disability"). The ADA and Section 504, which are both applicable to BU,[24] are frequently read in sync.

"It is the purpose of both the ADA and the Rehabilitation Act to provide a coherent framework and consistent and enforceable standards for the elimination of discrimination against persons with disabilities." *Thomas v. Davidson Academy,* 846 F.Supp. 611, 620 (M.D.Tenn.1994) (*citing* 42 U.S.C. § 12101(b)(1) and (2) and 29 U.S.C. § 701). Section 504, which "was the first broad federal statute aimed at eradicating discrimination against individuals with disabilities," *Helen L. v. DiDario,* 46 F.3d 325, 330 (3d Cir.1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 64, 133 L.Ed.2d 26 (1995), was a "sweeping[ ] statutory attempt to combat all forms of discrimination against the handicapped." *Allen v. Heckler,* 780 F.2d 64, 66 (D.C.Cir.1985). "Through [the ADA], the federal government extended the non-discrimination principles required of institutions receiving federal funds by the Rehabilitation Act to a much wider array of institutions and business." *Easley v. Snider,* 841 F.Supp. 668, 672 (E.D.Pa.1993)(internal citation omitted), *rev'd on other grounds,* 36 F.3d 297 (3d Cir.1994). The ADA thus "represents a major commitment by the federal government to assure adequate protection to Americans with dis-

---

24. The term "place of public accommodation" for the purpose of Title III of the ADA specifically includes a "nursery, elementary, secondary, undergraduate or postgraduate private school, or other place of education." 42 U.S.C. § 12181(7)(J). Section 504 of the Rehabilitation

Act applies on its face to "any program or activity receiving Federal financial assistance," 29 U.S.C. § 794, and the regulations implementing the statute recognize its applicability to postsecondary education. *See* 34 C.F.R. § 104.41.

abilities." *Jacques v. Clean–Up Group, Inc.,* 96 F.3d 506, 515 (1st Cir.1996).

The ADA and Section 504 specifically prohibit discrimination against the handicapped, not just based on invidious "affirmative animus," but also based on thoughtlessness, apathy and stereotypes about disabled persons. *See Alexander v. Choate,* 469 U.S. 287, 295–297, 105 S.Ct. 712, 717–718, 83 L.Ed.2d 661 (1985) (pointing to legislative history that § 504 would prohibit the denial of "special educational assistance" for handicapped children). Congress has found that individuals with disabilities are a "discrete and insular minority" who have been faced with restrictions and limitations "resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society." 42 U.S.C. § 12101(a)(7). The ADA defines discrimination to include: (1) the use of criteria that unnecessarily "screen out" or "tend to screen out" individuals with disabilities from the use and enjoyment of goods and services, (2) the failure to make nonfundamental, reasonable modifications of "policies, practices or procedures" when such modification is necessary to accommodate disabled persons, and (3) the failure to take necessary steps "to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals." 42 U.S.C. § 12182(b)(2) (defining "discrimination" under the ADA); *see also* 34 C.F.R. §§ 104.43—104.44 (implementing Section 504); 28 C.F.R. § 36.103 (stating that the ADA "shall not be construed to apply a lesser standard than the standard to be applied" under Section 504).

These statutes protect individuals who have a "disability," explicitly defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual," "a record of such an impairment," or "being regarded as having such an impairment." 42 U.S.C. § 12102(2); *accord* 29 U.S.C. § 706(8)(B)

(defining "handicapped person" for the purpose of the Rehabilitation Act). The regulations that interpret the statutes list "specific learning disabilities" among the physical or mental impairments that may render an individual "disabled" within the meaning of the acts. *See* 28 C.F.R. § 36.104 (implementing the ADA); 34 C.F.R. § 104.3(j)(2)(i)(B) (implementing Section 504).

### B. *Documentation Requirements*

▬ Plaintiffs argue that BU's new accommodations policy makes it unnecessarily difficult for students to document their learning disabilities when requesting accommodation.[25] Specifically, plaintiffs allege that BU's documentation requirements violate the provision of the ADA that defines discrimination to include:

> the imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(i); 28 C.F.R. § 35.130(b)(8); *accord* 34 C.F.R. § 104.4(b)(4) (interpreting Section 504); *see also Emery v. Caravan of Dreams, Inc.,* 879 F.Supp. 640, 643–644 (N.D.Tex.1995) (discussing the statutory term "criteria"). Under federal law, public entities cannot use eligibility criteria that screen out or tend to screen out individuals with disabilities unless they can show that the criteria are necessary. *See Doe v. Judicial Nominating Comm'n,* 906 F.Supp. 1534, 1540 (S.D.Fla.1995). This tend-to-screen-out concept, which is "drawn from current regulations under Section 504 (*see e.g.,* 45 C.F.R. § 84.13), makes it discriminatory to impose policies or criteria that, while not creating a direct bar to indi-

---

**25.** Plaintiffs also contend that BU's documentation requirements are discriminatory to the extent that they apply to students with learning disabilities and not to students with physical or mental disabilities. Because it is fairly well established that "the ADA does not mandate equali-

ty between individuals with different disabilities," *Parker v. Metro. Ins. Co.,* 121 F.3d 1006 (6th Cir.1997) (citing *Traynor v. Turnage,* 485 U.S. 535, 549, 108 S.Ct. 1372, 1382, 99 L.Ed.2d 618 (1988)), this assertion fails.

viduals with disabilities, diminish an individual's chances of such participation." *Doukas v. Metropolitan Life Ins. Co.,* 950 F.Supp. 422, 426 (D.N.H.1996). Plaintiffs need not show discriminatory intent to establish a violation of the ADA's tend-to-screen-out provision. *See Emery,* 879 F.Supp. at 643.

### 1. *BU's Eligibility Criteria*

■ At present, students who seek reasonable accommodation from BU on the basis of a learning disability are required to document their disability by: a) being tested by a physician, or a licensed psychologist, or an evaluator who has a doctorate degree in neuropsychology, education, or another appropriate field; b) producing the results of testing conducted no more than three years prior to the accommodation request; and c) providing the results of I.Q. tests in addition to the results of the normal battery of tests designed to assess the nature and extent of a learning disability. These requirements are "eligibility criteria" within the meaning of the ADA and Section 504 because they are policies that allow the university to judge which students are eligible for the learning disability services and to tailor reasonable academic accommodations provided by BU. *See Emery,* 879 F.Supp. at 643–644.

### 2. *Screen Out*

■ The ADA permits a university to require a student requesting a reasonable accommodation to provide current documentation from a qualified professional concerning his learning disability. *See Halasz v. Univ. of New England,* 816 F.Supp. 37, 46 (D.Me. 1993) ("When a university operates a program specifically for the handicapped, it clearly needs to know about an applicant's handicaps before it can make a decision about admission to the program."); *see also Farley v. Gibson Container Inc.,* 891 F.Supp. 322, 326 (N.D.Miss.1995) (finding that "[e]mployers should not be expected to recognize a physical impairment solely on an employee's 'say-so' "); *Miller v. Nat'l Cas. Co.,* 61 F.3d 627, 629 (8th Cir.1995) (quoting 29 C.F.R. app. § 1630.9); *Kalekiristos v. CTF Hotel Management Corp.,* 958 F.Supp. 641, 657 (D.D.C.1997)(holding that individuals "alleging a disability protected by the ADA [have]

the burden of establishing with medical evidence the existence of the alleged disability."); *cf. Grenier v. Cyanamid Plastics, Inc.,* 70 F.3d 667, 675–676 (1st Cir.1995) (allowing an employer to ask for medical certification from a treating psychiatrist).

Nevertheless, a university cannot impose upon such individuals documentation criteria that unnecessarily screen out or tend to screen out the truly disabled. 42 U.S.C. § 12182(b)(2)(i); *see also* 34 C.F.R. § 104.4(b)(4) (interpreting Section 504 so as to prohibit eligibility criteria that "have the purpose or effect of defeating or substantially impairing the accomplishment of the objectives of the recipient's program"). Just as a covered entity is prohibited from defining the offered benefit "in a way that effectively denies otherwise qualified handicapped individuals the meaningful access to which they are entitled," *Alexander,* 469 U.S. at 301, 105 S.Ct. at 720, so too is a university prevented from employing unnecessarily burdensome proof-of-disability criteria that preclude or unnecessarily discourage individuals with disabilities from establishing that they are entitled to reasonable accommodation. *Cf. Coleman v. Zatechka,* 824 F.Supp. 1360, 1368 (D.Neb.1993) (rejecting "unnecessary" eligibility requirements imposed on disabled students who seek to participate in the school's roommate assignment program).

In determining whether BU's documentation requirements "screen out or tend to screen out" students with learning disabilities, the Court considers separately each of the contested eligibility criteria and takes into account the changes that BU has made to its policies in response to this litigation.

#### a. *Currency Requirement*

■ During the 1995–1996 school year, BU's policy required that a student seeking accommodations on the basis of a learning disability submit documentation that had been completed within three years of the request for accommodation. This meant that students essentially had to be retested every three years. Based on the evidence, I easily find that this initial "currency" requirement imposed significant additional burdens on

disabled students. For example, Elizabeth Guckenberger testified that her retesting process took four days and cost $800.00. Jill Cutler's retesting took four hours and cost $650.00. Dean Robert Shaw testified that the evaluations could cost up to $1,000 and involve multiple visits. Cutler's tearful testimony was particularly compelling with respect to the emotional impact of the retesting because it was a poignant reminder that she was not "normal." BU's initial requirement mandating retesting for students with learning disabilities screened out or tended to screen out the learning disabled within the meaning of the federal law.

However, BU's retesting policy at present has been changed substantially to provide for a waiver of the reevaluation requirement. A recent statement of policy provides:

> Reevaluation is required to ensure that services and accommodations are matched to the student's changing needs. Comprehensive re-testing is not required. A student need only be re-tested for his previously diagnosed learning disability. The issue of what specific re-testing is required is, in the first instance, left to the discretion of the student's physician or licensed clinical psychologist. *If the student's physician or licensed psychologist believes that retesting is not necessary to reevaluate the student's learning disability, the physician or licensed clinical psychologist should write to DS to explain why. Retesting that is not medically necessary will be waived.*

(Emphasis added). This waiver process was reconfirmed in the procedural pronouncements that BU distributed in March of 1997. Thus, it is clear that the retesting can now be obviated if a qualified professional deems it not medically necessary.

I am not persuaded that BU's current retesting policy tends to screen out disabled students. The university's new waiver position appears consistent with plaintiffs' position that the need for retesting should be

examined on a student-by-student basis. This policy permits a qualified professional to evaluate the noncurrent testing data, examine issues of co-morbidity (whether other psychological or physical problems are contributing to the learning problem), and talk with the student to determine whether retesting is desirable, thereby meeting BU's goals without placing an undue burden on the students. In any event, the waiver provision is so new this Court has an insufficient record for determining how this policy is being implemented, and whether it tends to screen out students.

### b. *Credentials of Evaluators*

BU accepts evaluations and test results that document a learning disability only if the student's evaluator has certain qualifications. Plaintiffs appear to concede that a university can require credentialed evaluators; however, they argue that BU's policy of accepting only the evaluations of medical doctors, licensed clinical psychologists, and individuals with doctorate degrees is too restrictive. With respect to BU's narrow definition of the acceptable qualifications of the persons performing an evaluation, plaintiffs have proven that, both in its initial and current form, these eligibility criteria tend to screen out learning disabled students.

■ Many students (e.g., Greeley) with long histories of learning disorders in elementary and high school were tested by trained, experienced professionals whose credentials do not match BU's criteria but were deemed acceptable by the student's secondary school, and are acceptable under the guidelines set forth by the Association for Higher Education and Disabilities ("AHEAD").[26] BU's policy raises a high hurdle because it seemingly requires students with current testing to be retested if the evaluation has not been performed by a person with credentials acceptable to BU. As initially drafted and implemented, the policy tends to screen out students because of the

---

**26.** As discussed previously, an ad hoc committee of AHEAD has developed guidelines designed to serve as "standard criteria for verifying learning disabilities and attention deficit disorders (ADHD)." The Court gives great weight to the disinterested recommendations of the committee's authorities regarding the appropriateness of accommodations requests and the documentation that students should be required to provide.

time, expense and anxiety of having to be completely retested, even if their documentation has been recently performed by an evaluator who specialized in learning disabilities and who had a masters degree in education or developmental psychology.

To complicate things further, BU's implementation of the credentials policy has been uneven. It has permitted some students with learning disabilities to fulfill the requirement via the much less expensive route of asking an evaluator with the requisite credentials to review and confirm the evaluator's test results, while other students have been required to undergo a complete reevaluation. For example, plaintiff Jordan Nodelman only spent $150 to obtain a review of his original ADD evaluation from a licensed clinical psychologist, and there is no evidence that he had difficulty procuring the confirmation letter. However, though Scott Greeley was offered a similar concession, BU ultimately refused to accept Greeley's confirmation correspondence. Assuming that the Nodelman review procedure is unavailable under the current policy for students who have been tested by evaluators with masters degrees, I conclude that plaintiffs have proven that BU's present eligibility criteria concerning the credentials of the evaluators tend to screen out some students with learning disabilities.

■ One caveat. With respect to BU students who have not been tested for a learning disability prior to matriculation at the university, there is no evidence that testing by evaluators with doctorate degrees is significantly more expensive or burdensome than testing by a person with a masters degree. Also, there is no evidence that it is more difficult to locate or to schedule an appointment with a person with credentials acceptable to BU, particularly in an academic mecca like Boston. This Court finds that BU's credentials requirement does not tend to screen out students who do not have to bear the burden of being *re* tested in order to satisfy BU's qualifications mandate.

### c. I.Q. Tests

■ Finally, plaintiffs have offered no persuasive evidence that BU's requirement that a student provide his I.Q. test scores tends to screen out any students. Indeed, under the AHEAD guidelines, the diagnostic criteria in the DSM IV, and the standards in 29 states, IQ tests are administered as part of a learning disabilities assessment.

### d. BU's Response

BU argues that neither its initial or its current documentation criteria "screen out" the learning disabled within the meaning of federal law because there is no persuasive evidence that its requirements have had the effect of actually preventing students with learning disabilities from getting accommodations from the university. The strongest evidence in support of BU's position is that all of the named plaintiffs, after much hassle, eventually received the requested accommodations (except course substitutions) from BU in spite of its new and more burdensome documentation requirements. BU also attempted to present data suggesting that roughly the same number of students are receiving accommodations under the current policy as during the prior LDSS reign.[27]

■ Contrary to BU's assertions, plaintiffs have demonstrated that BU's initial eligibility criteria actually screened out students. The number of enrolled students who self-identify as learning-disabled dropped 40 percent between the 1994–1995 academic year and the 1996–1997 academic year. Moreover, as considered in detail above, plaintiffs have established that as initially implemented, the currency and qualifications requirements were burdensome and, thus, they at least tended to screen out the disabled students. *See Ellen S. v. Florida Bd. of Bar Examiners,* 859 F.Supp. 1489, 1494 (S.D.Fla.1994) (concluding that "a board can discriminate against qualified applicants by placing additional burdens on them and this discrimination can occur *even if these applicants are subsequently granted licenses to*

---

**27.** Testimony regarding these statistics was excluded from the trial as essentially unreliable. At any rate, such data is only partially helpful because it does not compare the specific accommodations requested with those that the students actually received.

*practice law"*) (emphasis added); *Clark v. Virginia Bd. of Bar Examiners,* 880 F.Supp. 430, 442 (E.D.Va.1995) (finding that an unnecessary mental health question on a bar application violates the ADA's prohibition against discriminatory eligibility criteria even though "it is not clear that Question 20(b) 'screens out' potential applicants").

#### 3. *Necessity*

■ Documentation requirements that screen out or tend to screen out disabled students—in this case, the qualification criteria and the currency requirement as it was initially imposed—still do not violate the ADA and Rehabilitation Act if BU can demonstrate that the requirement is a "necessary" part of the accommodations process. *See* 42 U.S.C. § 12182(b)(2)(i) (prohibiting as discriminatory criteria that screen out or tend to screen out the disabled *"unless such criteria can be shown to be necessary for the provision of the goods [or] services. being offered"*) (emphasis added); *Coleman,* 824 F.Supp. at 1368 (considering whether defendants have established that "the additional eligibility requirements ... are 'necessary' to the roommate assignment program"); *cf. Judice, M.D. v. Hospital Serv. Dist. No. 1,* 919 F.Supp. 978, 982 (E.D.La.1996) (stating that the ADA allows entities to impose different eligibility criteria on the disabled "if *necessary* for their safe operation") (emphasis added). Again, I consider the necessity of the criteria separately.

#### a. *Currency*

Because every expert who testified agreed that there is no demonstrable change in a specific learning disorder, such as dyslexia, after an individual reaches age 18, BU has failed to demonstrate that the three-year retesting requirement, as initially written,[28] was necessary for students who had been diagnosed with specific learning disorders.

■ Professor Shaywitz of Yale University School of Medicine, a physician and medical researcher in the area of dyslexia, has performed a comprehensive longitudinal study of the changes in a large population of dyslexic children over an extended period of time. She testified that dyslexia causes a persistent, life-long deficit in the ability to decode language at the most basic levels of intellectual functioning. This deficit persists after age 18 and does not change. Defendants have produced no peer reviewed literature or scientific testimony that provides evidence for the idea that a person's learning disability will show any change after adulthood, or that a student's test scores will show significant change during the course of their college career. Indeed, there are no peer-reviewed studies about the need for current evaluations in the post-secondary educational environment. Moreover, no other college or university in the United States or Canada requires retesting after age 18,[29] and the AHEAD guidelines call for retesting every *five* years once an individual reaches adulthood.

To show that learning disabilities change over time, BU relies in part on the testimony of plaintiffs' expert Dean Shaw of Brown University. Shaw testified that approximately 25 percent of the students at Brown University who begin college with accommodations do not need them by the time they graduate. This opinion is consistent with Dr. Shaywitz's research that many so-called "compensated" dyslexics may actually learn

---

**28.** The Court has found that, because of the waiver option, BU's *present* policy does not tend to screen out students with learning disabilities within the meaning of the federal law.

**29.** Although the Court has considered evidence regarding the policies and practices of other educational institutions, it should be noted that I did not rely on Professor Blanck's survey, which was offered by the plaintiffs as evidence of the documentation criteria used by schools other than BU, because it did not have sufficient indicia of trustworthiness and reliability. *See Toys "R" Us, Inc. v. Canarsie Kiddie Shop, Inc.,* 559 F.Supp.

1189, 1205 (E.D.N.Y.1983) (finding that, among other things, the subjects of the survey must be a representative sample of a properly-defined universe, the questions must be clear and precise, and the interviewers must be unbiased). Among other things, the telephone survey was conducted in preparation for this litigation by at least two research assistants—one of whom worked for the advocacy group representing the plaintiffs in this action and the other was entirely unknown to Professor Blanck. To compound the problem of the potential bias of the interviewer, the questions that were asked were imprecise.

to read, even though the decoding effort remains laborious, tiring and slow. Another defense expert, Professor Hynd, believed that retesting would provide "important insights" to a university monitoring co-morbid psychological and physiological conditions (because 30 to 40 percent of all individuals with reading disabilities have a co-morbid condition such as ADHD, depression or anxiety disorders), and that retesting even on a quarterly or semesterly basis would help an institution to make the most accurate determination of appropriate accommodations.

Nevertheless, Dr. Shaywitz testified credibly that "once a student comes to school diagnosed with a learning disability, there is no test that is currently available that can determine precisely what accommodations should be provided to a particular student." Professor Hynd's desire for retesting semesterly might be appropriate in an "ideal" world, but few would argue it is "necessary" to do the job. If there is a history of psychological problems in a student, a reevaluation may be appropriate to monitor the co-morbid conditions that Professor Hynd was fairly concerned about; however, the defendants have not proven, as they must, that retesting every three years is "necessary" in adulthood.[30]

█ On the other hand, BU has presented credible evidence that reevaluation of students with ADD and ADHD is essential because the symptoms of ADD and ADHD change in different environments, are often treated with medication, and these disorders often remit from adolescence to adulthood. Professor Rachel Klein, one of the foremost authorities in this area, testified credibly about the need for current information.

b. *Qualifications Requirements*

BU argues that it is necessary to set a high standard for the qualifications of evaluators in order to prevent overdiagnoses for learning disabilities like dyslexia, and to ensure proper documentation of conditions such as ADD and ADHD. To support its assertion that a master's degree does not meet its quality litmus test, it argues in its legal briefs that "[a] doctorate degree is more likely to bring an evaluator into contact with new research and changes in the field. Evaluators with lower degrees tend not to have the sophistication necessary to properly evaluate people with attention deficit disorders and learning disabilities." BU points to the research of Associate Professor Richard Sparks, who believes that overdiagnosis of learning disabilities for students seeking foreign language waivers or substitutions is a problem in the field, and to testimony that between twenty and thirty percent of college students seeking accommodations due to a learning disability provide insufficient documentation. Klafter testified that although there was a large number of potential evaluators, he wanted only the "best evaluations available."

To begin with, BU has produced no evidence that its initial policy in effect from November of 1995 through March of 1997, which required that learning disabled students could only submit evaluations prepared by physicians and licensed clinical psychologists, was necessary to ensure proper documentation and prevent overdiagnosis. Under this initial policy, two of BU's experts at trial who had doctorates in education—Professors Sparks and Hynd—would have been precluded from providing evaluations of learning disabled students. Accordingly, the initial policy flunks the necessity test because BU failed to show the need to preclude evaluators with doctorates in education from providing evaluations.

The post-March 1997 policy is a tougher question because it uses a doctorate degree as the proxy for quality. There is an intuitive appeal to this bright line because evaluators with doctorates generally do have more training and a better education than those with only a masters degree. However, BU's

---

**30.** BU has persuasively demonstrated that it is necessary to have current documentation through the twelfth grade. The Department of Education requires re-evaluation of children with learning disabilities every three years during elementary and secondary school, and none of plaintiff's experts testified that such testing throughout adolescence was unnecessary. However, as Dr. Shaywitz says, these regulations are not applicable to post-secondary education, in part, because younger school age children have a different growth rate than adults.

burden is a heavy one because it must show that the more stringent eligibility criterion is "necessary" to achieve its goal of ensuring proper documentation. The record is sparse on the point. While concerns about improving the quality of documentation of learning disabilities are valid, there is no evidence that reports or testing by those evaluators with masters degrees are worse than those by Ph.D.'s, nor is there evidence that a Ph.D. gets better training than a person with a masters in the specific standardized testing that must be conducted to diagnose learning disabilities. Indeed, the AHEAD guidelines list "educational psychologists" and "learning disabilities specialists" among the professionals who may have the experience that qualifies them to diagnose learning disabilities.

The best argument advanced in support of a doctorate requirement is that an evaluator with a lesser level of education may be too focused on learning disabilities and have insufficient training to pick up other "co-morbid" causes for poor academic performance (like medical or psychological problems). However, this myopia concern could be alleviated with a waiver policy akin to the one followed for Nodelman which required an evaluator with a doctorate to evaluate the prior testing to determine its adequacy. In short, BU bears the burden of proving a complete re-evaluation by a person with doctorate degree or a licensed psychologist is "necessary" to accomplish its goal of improving the quality of evaluations. Because it has not met its burden, the Court concludes that the blanket policy requiring students to be retested if the prior evaluator has only a masters degree violates federal law.

■ On the other hand, BU has met its burden of proof with respect to the credentials necessary to evaluate ADD and ADHD. These conditions are primarily identified through clinical evaluations rather than through standardized testing, and a well-trained eye is essential for proper diagnosis. Defendants' expert Professor Klein testified credibly that an evaluator with a Ph.D. or an M.D. is more likely to distinguish between ADD/ADHD and medical or psychological conditions that present comparable symptoms. The Court is persuaded that, in regard to ADD/ADHD, a doctorate level of training is "necessary" within the meaning of the federal law.

### C. BU's Evaluation Procedure

Plaintiffs contend that BU's process for evaluating accommodation requests is discriminatory because Westling and Klafter, who are actively participating in closed-door evaluations of student files, have no expertise in learning disabilities and are motivated by false stereotypes about learning disabled students. Moreover, the class contends that BU's evaluation process is insufficiently "interactive" and that students with learning disabilities have been denied the right to due process (as guaranteed by Section 504 regulations) because BU has failed to provide a neutral grievance procedure when a student's requests for accommodations has been denied.[31]

#### 1. Process for Reviewing Accommodation Requests

The ADA and Section 504 forbid both intentional discrimination against learning disabled students and "methods of administration" that "have the effect of discriminating on the basis of disability." *See* 42 U.S.C. § 12182(b)(1)(D); *see also* 34 C.F.R. § 104.4(b)(4). In considering these allegations, the Court distinguishes between the review process that existed during the 1995–1996 school year, when the policy was first implemented, and the procedure that exists at present.

■ The concerns about the nitty-gritty involvement of Westling and Klafter in the accommodations process during the 1995–1996 school year are well founded. There is no dispute that Westling and Klafter, who have no expertise in learning disabilities and no training in fashioning reasonable accommodations for the learning disabled, were actively involved in the process of approving accommodation requests at that time. Worse still, during that year, these adminis-

---

**31.** As a procedural matter, the parties have agreed that I can consider evidence submitted in support of the motions for summary judgment as well as the bench trial to evaluate these claims.

trators expressed certain biases about the learning disabilities movement and stereotypes about learning disabled students. Westling and Klafter indicated repeatedly that many students who sought accommodations on the basis of a learning disability were lazy or fakers (e.g., "Somnolent Samantha"), and Klafter labeled learning disabilities evaluators "snake oil salesmen." If not invidiousness, at the very least, these comments reflect misinformed stereotypes that, when coupled with Westling and Klafter's dominant role in the implementation of BU's accommodations policy during the 1995–1996 school year, conflicted with the university's obligation to provide a review process "based on actual risks and not on speculation, stereotypes, or generalizations about disabilities." H.R.Rep. No. 101–485, pt. II, at 105 (1990), *reprinted in* 1990 U.S.C.C.A.N. 267, 388; *see also Mantolete v. Bolger*, 767 F.2d 1416, 1422 (9th Cir.1985) (finding that Congress's intent in enacting the Rehabilitation Act was "to prevent employers from refusing to give much needed opportunities to handicapped individuals on the basis of misinformed stereotypes").

BU's internally-contentious, multi-tiered evaluation process involving evaluators who were not only inexperienced but also biased caused the delay and denial of reasonable accommodations and much emotional distress for learning disabled students. The Court concludes that the implementation of BU's initial accommodations policy violated the ADA and Section 504 during the 1995–1996 academic year.

The issue for purposes of the requested declaratory and injunctive relief, however, is whether the current procedure is propelled by discriminatory animus or has the effect of discrimination on the basis of disability. *See Anderson v. University of Wisc.*, 841 F.2d 737, 741 (7th Cir.1988) ("[T]he Rehabilitation Act requires only a stereotype-free assessment of the person's abilities and prospects rather than a correct decision."). This Court concludes that it does not.

■ At present, Lorraine Wolf, a highly trained professional, makes the initial evaluation as to whether the student is learning disabled and whether the requested accommodations are reasonable. Plaintiffs do not claim she is a wolf in lamb's clothing. They do not challenge her credentials or good faith. While she does forward all recommendations for accommodations to Westling's office, there is no evidence that her professional judgments have been second-guessed or that Klafter does anything other than "rubberstamp" her impartial recommendations. Although BU has occasionally refused a student's request to abrogate a substantial academic requirement since Wolf's arrival, there is no evidence to suggest that the decision not to modify that degree requirement was unreasonable or discriminatory. In sum, plaintiffs have not proven that the present method of administering the learning disability program has the effect of discrimination on the basis of disability, or is tainted by impermissible stereotypes.

■ The plaintiffs also make the argument that the ADA and Section 504 require BU to engage in an "interactive" process in fashioning accommodations for students with learning disabilities, and that BU's review process fails to meet that obligation. In the employment context, courts have held that "[a]n employee's request for reasonable accommodation requires a great deal of communication between the employee and the employer." *Bultemeyer v. Fort Wayne Community Schs.*, 100 F.3d 1281, 1285 (7th Cir.1996). Although a disabled employee must first make his limitations known, *see Taylor v. Principal Financial Group, Inc.*, 93 F.3d 155, 165 (5th Cir. 1996), *cert. denied*, —— U.S. ——, 117 S.Ct. 586, 136 L.Ed.2d 515 (1996), "the employer has at least some responsibility in determining the necessary accommodation" by engaging in "an interactive process." *Beck v. University of Wisc. Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996) (quoting 29 C.F.R. § 1630.2(*o*)(3) (1995)); *accord Mantolete v. Bolger*, 767 F.2d at 1423 ("[A]n employer has a duty under the Act to gather sufficient information from the applicant and from qualified experts as needed to determine what accommodations are necessary to enable the applicant to perform his job safely."); *see also Feliberty v. Kemper Corp.*, 98 F.3d 274, 280 (7th Cir.

1996) ("The determination of a reasonable accommodation is a cooperative process in which both the employer and the employee must make reasonable efforts and exercise good faith."). However, engaging in a specific give-and-take procedure is not always essential in fashioning the appropriate reasonable accommodation. *Jacques v. Clean–Up Group, Inc.*, 96 F.3d 506, 514 (1st Cir. 1996).

■ During much of the 1995–1996 academic year, the administration of the learning disability program miserably failed to achieve any measure of interactivity. The president's office did not communicate directly with LDSS and vice versa. Learning disabled students desperately seeking information concerning the status of their reasonable accommodations requests received conflicting information from university officials, wrong information, or no information at all. When accommodations were denied, inadequate explanations of the documentation deficiencies were provided, and parental inquiries were fruitless. While DS head Macurdy did his best in March of 1996 to handle the problem, he was inadequately staffed and trained.

BU's administrative methods during 1995–1996 were also not sufficiently interactive to the extent that unwary students were ambushed by the new, unwritten requirements for accommodation, and the multi-tiered process for reviewing student files was not clearly developed or disclosed. For example, by Westling's insistence that the new policy on course substitutions be implemented "effective immediately"—without giving students any notice or time to adjust—and Brinckerhoff's precipitous letter requesting retesting at exam time, BU failed to communicate effectively its new accommodation mandates. Westling and Klafter point the finger at Brinckerhoff for much of the insensitivity, delays, poor communication, and bad timing at LDSS. Even if Brinckerhoff fairly shoulders the blame, he, too, is a university official. As a result of BU's representatives' poor implementation of the policy, many students who applied for accommodations at the beginning of the fall semester were not given the requested assistance or even told of the reason for the delay so that documentation

deficiencies could be remedied until some time in November—long after classes had begun. At least one student was not accommodated until the following semester.

For the purposes of prospective relief, however, the bleak picture has brightened. No doubt as a result of this litigation, the university has now formulated harmonious written statements of policy that have been authorized by the relevant academic officials. Moreover, the university has hired a professional evaluator who, at trial, promised that she will meet with students and address their concerns as she assesses their need for accommodation.

■ This Court finds that BU's current review process—now that Wolf is back from maternity leave and the office is staffed up— is sufficiently interactive to withstand the attack under the ADA and Section 504. Plaintiffs have submitted no evidence that students requesting personal meetings do not get them, that phone calls are not returned, that misinformation is generated, or that accommodations requests are not timely handled. Even though BU no longer works as closely with students as it did under Brinckerhoff, this Court has no evidence that, as revamped, the administration of the current learning disabilities review procedure has the effect of discriminating against students.

### 2. *Appeals Procedure*

■ Since 1995, President Westling (or his staff) has reviewed the initial accommodations recommendations generated by LDSS (and now by Wolf), and in addition, Westling has served as the administrative officer who decides a learning-disabled student's specific appeal or denial. At the summary judgment stage of this litigation, plaintiffs urged this Court to find that such an appellate procedure fails to "incorporate appropriate due process procedures" as mandated by 34 C.F.R. § 104.7(b). In relevant part, 34 C.F.R. § 104.7 provides:

(b) *Adoption of grievance procedures.* A recipient that employs fifteen or more persons shall adopt grievance procedures that incorporate appropriate due process standards and that provide for the prompt and

equitable resolution of complaints alleging any action prohibited by this part.

34 C.F.R. § 104.7. The weight of the evidence at trial supports the plaintiffs' contention that BU offers no meaningful "appellate" review of a decision to reject a requested accommodation. Many students have been informed in writing and verbally that they must ask Westling, who had made the initial determination, to reconsider their denials.

■ Although BU now contends that the student handbook provides a Section 504 grievance procedure that involves appeal to an independent compliance officer, the Court is not persuaded that such an avenue is a realistic alternative for learning disabled students seeking accommodations for essentially four reasons. First, the *Lifebook* (a student handbook), refers only to the grievance procedures in cases of alleged discrimination by reason of "physical disability" and does not mention requests for grievances by students with learning disabilities. Second, the evidence showed that no student seeking reconsideration for a denial of an accommodation was ever advised orally or in writing to use the 504 procedure. Third, it seems dubious that the dean of students or the head of the DS office, who purportedly handle Section 504 grievances, would have the authority (or the chutzpah) to review and reverse the determination of the boss, BU's president. Finally, most of the relevant officials (including Klafter and Westling) were seemingly unaware of this avenue of appeal as a means of rectifying improper denials of reasonable accommodation.

■ Although plaintiffs may have a strong argument on the merits of their challenge to BU's weak appeals/grievance procedure, no private cause of action exists to enforce this regulatory due process provision. The traditional analysis that governs a court's evaluation of whether there is an implied private right of action to enforce a statute supports the Court's conclusion. *See Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975). Some courts have found *Cort's* analysis factors are useful when courts seek to determine whether there is a private right of action to sue under *administrative* enactments as well. *See, e.g., Roberts v.*

*Cameron–Brown,* 556 F.2d 356, 360 (5th Cir. 1977) (applying the *Cort* analysis to decide whether an implied private cause of action exists to enforce the provisions of a H.U.D. handbook).

■ The *Cort* factors are: (1) whether the plaintiff is a member of the class for whom the statute was created, (2) whether there is an indication of legislative intent either to create or deny a private remedy, (3) whether a private right of action is consistent with the purposes underlying the legislative scheme, and (4) whether the cause of action is traditionally relegated to state law. *See id.* at 78, 95 S.Ct. at 2087–2088.

■ Of the four *Cort* factors, only one strongly supports plaintiff's position that a private right of action to enforce 34 C.F.R. § 104.7 should be implied. Under the first factor, the plaintiffs here are, indeed, a part of the class that is intended to benefit from grievance procedures that comport with traditional due process standards. However, since the due process provision appears only in the administrative regulation, there is no evidence whatsoever of the second *Cort* factor—that Congress intended to give private parties the right to a private remedy against institutions that fail to provide adequate grievance procedures. The only explicit statements relating to § 104.7 emanate from the Department of Education, *see* 34 C.F.R. § 104, app. A, at 358, and the intent of an administrative agency in drafting a regulation cannot be the conclusive basis for finding that Congress desired to provide a private right of action. *See* 34 C.F.R. § 104, app. A, at 357; *Touche Ross & Co. v. Redington,* 442 U.S. 560, 568, 99 S.Ct. 2479, 2485, 61 L.Ed.2d 82 (1979). If anything, the fact that the ADA, which was enacted well after Section 504 and its regulations, is silent regarding whether the disabled have a right to grievance procedures that incorporate due process standards suggests a legislative intent not to use the federal antidiscrimination laws as a vehicle for guaranteeing due process rights.

Other courts have similarly declined to recognize private rights of action under other administrative regulations that go beyond the substantive authorization of Section 504. *See*

*Dopico v. Goldschmidt,* 687 F.2d 644, 651 (2d Cir.1982) (holding that even though there was an implied right of action to maintain a suit directly under Section 504,[32] there was no right to enforce the underlying regulations when they appeared to exceed the substantive scope of the statute.); *see also Stewart v. Bernstein,* 769 F.2d 1088, 1093 n. 6 (5th Cir.1985) (rejecting plaintiff's claim that she could sue a private nursing home for violating Medicare regulations, and noting that "federal regulations cannot themselves create a cause of action").

The recent decision of *Cooper v. Gustavus Adolphus College,* 957 F.Supp. 191 (D.Minn. 1997), is most instructive. In *Cooper,* a professor who had been dismissed by the College for violating its sexual harassment policy claimed that he had been denied the right to fair dismissal proceedings under the regulations that enforce Title IX.[33] Like the regulations implementing Section 504, the regulations under Title IX require educational institutions in receipt of federal funds to adopt grievance procedures that provide for "prompt and equitable resolution of student and employee complaints."[34] The *Cooper* court dismissed the professor's claim because, "even if ... Title IX requires that any grievance process be fair to an accused employee, [the plaintiff] has failed to demonstrate that such a right may be enforced through a private cause of action." *Id.* at 194. It concluded that "alleged flaws in a sexual harassment procedure were not actionable in the absence of a 'particularized allegation relating to a causal connection between the flawed outcome and gender bias.'" *Id.* (quoting *Yusuf v. Vassar College,* 35 F.3d 709, 715 (2d Cir.1994)).

Like the court in *Cooper,* I find that a student has no cause of action to enforce the Section 504 regulations guaranteeing due process because "there is no statutory due process right separate from a right to be free from discrimination." *Id.*

### D. Course Substitutions

#### 1. The Competing Contentions

Plaintiffs claim that BU's blanket refusal to authorize course substitutions for students with learning disabilities amounts to a failure to modify the university's practices to prevent discrimination as required by federal law. Specifically, the class argues that, because many learning-disabled students have extreme difficulty in taking and passing courses in mathematics and foreign language, allowing course substitutions for those class members is a reasonable accommodation, and, thus, BU's refusal to authorize such a modification is discriminatory.

BU asserts that its refusal of course substitutions is consistent with the law because exemptions of this nature would amount to a fundamental alteration of its academic liberal arts program, a course of study that has been in place for over a century. Also, BU emphasizes that it provides special programs for students with foreign language and math difficulties (like an oral enhancement program and one-on-one tutoring) in addition to the classroom accommodations that are available in any other course.

#### 2. The Legal Framework

"An accommodation is generally any change in the work [or school] environment or in the way things are customarily done that enables an individual with a disability to enjoy equal opportunities." *Thomas v. Davidson Academy,* 846 F.Supp. 611, 618 (M.D.Tenn.1994) (citing 29 C.F.R. § 1630.2(*o*)); *accord Burch v. Coca–Cola Co.,* 119 F.3d 305, 314–315 (5th Cir.1997) ("In all cases a reasonable accommodation will in-

---

**32.** *Accord Pandazides v. Virginia Bd. of Ed.,* 13 F.3d 823, 828 (4th Cir.1994); *Pushkin v. Regents of the Univ. of Colo.,* 658 F.2d 1372, 1377–78 (10th Cir.1981) (citing cases).

**33.** In relevant part, Title IX provides:
No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.
20 U.S.C. § 1681(a) (1988).

**34.** These regulations are not entirely analogous to the provisions at issue here, for the regulations under Section 504 mandate that, in addition to being prompt and equitable, a school's proceedings "incorporate appropriate due process procedures." 34 C.F.R. § 104.7(b).

volve a change in the status quo, for it is the status quo that presents the very obstacle that the ADA's reasonable accommodation provision attempts to address."). The ADA specifically defines discrimination to include:

a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii). The regulations implementing Section 504 also require an educational institution that receives federal funding to "make such modifications to its academic requirements as are necessary to ensure that such requirements do not have the effect of discriminating, on the basis of handicap, against a qualified handicapped applicant or student." 34 C.F.R. § 104.44 (entitled "Academic Adjustments"). However, the regulations further explain that "academic requirements that the recipient can demonstrate are essential to the program of instruction being pursued by such student . . . will not be regarded as discriminatory within the meaning of this section." *Id.*

■■■ Significantly, with regard to academic institutions, the regulations interpreting Section 504 provide that reasonable modifications "may include changes in the length of time permitted for the completion of degree requirements, *substitution of specific courses required for the completion of degree requirements*, and adaptation of the manner in which specific courses are conducted." 34 C.F.R. § 104.44 (emphasis added). *See Alexander*, 469 U.S. at 302 n. 21, 105 S.Ct. at 720 n. 21 (pointing to a similar regulation in discussing the "view that reasonable adjustments in the nature of the benefit offered must at times be made to assure meaningful access"). The appendix to the regulations elaborates:

Paragraph (a) of § 104.44 requires that a recipient make certain adjustments to academic requirements and practices that discriminate or have the effect of dis-

criminating on the basis of handicap. This requirement, like its predecessor in the proposed legislation, does not obligate an institution to waive course or other academic requirements. But such institutions must accommodate those requirements to the needs of individual handicapped students. For example, an institution might permit an otherwise qualified handicapped student who is deaf to substitute an art appreciation or music history course for a required course in music appreciation or could modify the manner in which the music appreciation course is conducted for the deaf student. *It should be stressed that academic requirements that can be demonstrated by the recipient to be essential to its program of instruction or to particular degrees need not be changed.*

34 C.F.R. § 104, app. A ¶ 31 (emphasis added). In interpreting these regulations, the Office of Civil Rights ("OCR"), the federal agency responsible for investigating complaints of disability discrimination, has consistently maintained that, even though an educational institution must modify its academic requirements to accommodate a disabled student, an institution need not waive academic requirements that are essential to its program or course of study. *See, e.g., Bennett College*, 7 Nat'l Disability L. Rep. ¶ 26 (1995); *Northern Ill. Univ.*, 7 Nat'l Disability L. Rep. ¶ 39 (1995); *City Univ. of N.Y.*, 3 Nat'l Disability L. Rep. ¶ 104 (1992); *Cabrillo College*, 2 Nat'l Disability L. Rep. ¶ 78 (1991).

Besides these legislative and administrative pronouncements, several federal courts have also addressed specifically the obligation of an educational institution under the ADA and Section 504 to accommodate disabled students by making reasonable modifications of academic requirements. In *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Supreme Court decided whether Section 504 required a college to make substantial changes to its nursing program for a student with hearing loss. Refusing to admit the student, the College claimed that "[the] modifications that would be necessary to en-

able safe participation would prevent her from realizing the benefits of the program." *Id.* at 401–402, 99 S.Ct. at 2365. The Court concluded that Section 504 "does not compel educational institutions to disregard the disabilities of handicapped individuals or to make substantial modifications in their programs to allow disabled persons to participate." *Id.* at 405, 99 S.Ct. at 2366. Although the student argued that the statute and its regulations required the College to take affirmative steps to ensure that she could participate (e.g., individual supervision, an exemption from clinical coursework), the Court maintained that "[s]uch a fundamental alteration in the nature of a program is far more than the 'modification' regulation requires." *Id.* at 410, 99 S.Ct. at 2369. Justice Powell wrote:

> It is undisputed that respondent could not participate in Southeastern's nursing program unless the standards were substantially lowered. Section 504 imposes no requirement upon an educational institution to lower or to effect substantial modifications of standards to accommodate a handicapped person.

*Id.* at 413, 99 S.Ct. at 2370–2371.

In retrospect, the Supreme Court has observed that its opinion in *Davis* "struck a balance between the statutory rights of the handicapped to be integrated into society and the legitimate interests of federal grantees in preserving the integrity of their programs." *Alexander,* 469 U.S. at 300, 105 S.Ct. at 720. The lesson of *Davis* (and its progeny) is that "while a grantee need not be required to make 'fundamental' or 'substantial' modifications to accommodate the handicapped," under Section 504 and the ADA "it may be required to make 'reasonable' ones." *Id.; see, e.g., McGregor v. Louisiana State Univ. Bd. of Supervisors,* 3 F.3d 850, 860 (5th Cir.1993)(finding that a disabled law student's requested accommodation would force the school to "lower its academic standard" or "compromise the reasonable policy of its academic program" and that "Section 504 did not require this much"); *Doherty v. Southern College of Optometry,* 862 F.2d 570, 574–575 (6th Cir.1988) (holding that federal law imposes on colleges a "limit-

ed obligation to make reasonable accommodations to handicapped individuals," and that, under the circumstances, "[w]aiver of a necessary requirement would have been a *substantial* rather than merely a *reasonable* accommodation") (emphasis added). It is clear from the cases interpreting Section 504 and the ADA that "[a]n educational institution is not required to accommodate a handicapped individual by eliminating a course requirement which is reasonably necessary to proper use of the degree conferred at the end of a course of study." *Doherty,* 862 F.2d at 570.

In the reasonable modifications context, the plaintiff has the initial burden of proving "that a modification was requested and that the requested modification is [generally] reasonable," that is, "in the run of cases." *Johnson v. Gambrinus Co.,* 116 F.3d 1052, 1059 (5th Cir.1997). One circuit court has ruled that the plaintiff's burden, at least with regard to reasonable modification in the workplace, is only a "burden of production" and, as such, it "is not a heavy one." *Borkowski v. Valley Cent. Sch. Dist.,* 63 F.3d 131, 138 (2d Cir.1995) (finding that "[i]t is enough for the plaintiff to suggest the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits"). "If the plaintiff meets this burden, the defendant must make the requested modification unless the defendant pleads and meets its burden of proving that the requested modification would fundamentally alter the nature of the public accommodation." *Johnson,* 116 F.3d at 1059; *see also Wagner v. Fair Acres Geriatric Ctr.,* 49 F.3d 1002, 1009 (3rd Cir.1995) ("[I]f there is no factual basis in the record demonstrating that accommodating the individual would require a fundamental modification ... then the handicapped person is otherwise qualified.") (citation omitted).

### 3. *The Analysis*

Turning to the instant case, the Court must first consider whether plaintiffs have met their burden of establishing that course substitutions in math and foreign language are, generally, "reasonable" accommodations.

■ The plaintiffs are aided substantially in satisfying their initial burden by the mere fact that the administrative regulations interpreting Section 504 and the ADA specifically provide that modifying academic requirements to allow course substitutions may be a reasonable means of accommodating the disabled. *See* 34 C.F.R. § 104, app. A ¶ 31. In addition, plaintiffs offered evidence at trial to support their contention that a course substitution is reasonable, at least in regard to BU's foreign language requirements. Even though the experts disagreed as to whether a language disability made acquisition of a foreign language literally impossible for some students, and plaintiffs' experts conceded there are no peer-reviewed scientific studies which indicate that it is impossible for a student with a learning disability to learn a foreign language, the weight of the evidence supports plaintiffs' arguments that students with learning disorders such as dyslexia have a significantly more difficult challenge in becoming proficient in a foreign language than students without such an impairment. The only evidence to the contrary was the testimony of defendants' expert, Professor Sparks, who has recently concluded that difficulties in learning foreign languages are not necessarily attributable to learning disabilities. However, Sparks conceded that his research was "preliminary." Although another defense expert, George Hynd, testified that most students had the potential to learn with appropriate accommodations, he agreed that persons with learning disabilities may have difficulty learning a foreign language because of neurological deficits. On all of the evidence, the Court is persuaded that plaintiffs have demonstrated that requesting a course substitution in foreign language for students with demonstrated language disabilities is a reasonable modification.

■ With respect to math course substitutions, however, I conclude that there was no scientific evidence introduced at trial to support plaintiffs' claim that a course substitution is a plausible alternative for a learning disability in mathematics (i.e., dyscalculia). Dyscalculia is specifically listed in the DSM–IV as a learning disorder; however, none of the named testifying plaintiffs had dyscalculia, and the record documents that only two students in CLA requested a course substitution in mathematics. Moreover, plaintiffs' witness, Dean Robert Shaw of Brown University, who is an Associate Professor of Education and the coordinator of the learning disability program, testified that he never met a student with a disability that prevented her from learning math. Professor Seigel, an expert called by the defense, found one student (out of the twenty-eight files) who she claimed had a severe case of "dyscalculia" entitling him to accommodations; however, Professor Seigel testified that "with the appropriate accommodations," a student should be able to fulfill BU's mathematics requirements. Moreover, with regard to the one student whose file she reviewed, Seigel never said that the condition was so severe that a course substitution was needed. Essentially, the evidence at trial concerning dyscalculia was sketchy at best. Accordingly, plaintiffs have not demonstrated that a request for a course substitution in mathematics is a reasonable modification of BU's degree requirements.

Because plaintiffs have established that the request for a course substitution in foreign language is reasonable, the burden now shifts to BU to demonstrate that the requested course substitution would fundamentally alter the nature of its liberal arts degree program.

Fortunately, in determining which modifications amount to a "fundamental alteration," the Court does not write on a clean blackboard. Two related First Circuit cases provide invaluable assistance in evaluating a university's burden of supporting its conclusion that a requested modification by a learning disabled student of an academic requirement would fundamentally alter the nature of the program. *See Wynne v. Tufts Univ. Sch. of Med.*, 932 F.2d 19 (1st Cir.1991)(en banc)(hereinafter *"Wynne I"*); *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791 (1st Cir.1992) (hereinafter *"Wynne II"*). Both *Wynne* opinions, which arise out of a single student's efforts to get Tufts' Medical School to change its testing policy to accommodate his learning disability, bear discussion at length.

Stephen Wynne was admitted to Tufts Medical School in 1983. After experiencing extreme difficulty with the multiple-choice format of his first year examinations, and after failing eight out of fifteen first-year courses, Wynne underwent a neuropsychological evaluation at the expense of the medical school. The evaluation revealed that Wynne had serious processing difficulties indicative of a learning disability. It was later discovered that, in particular, Wynne had difficulty interpreting the type of multiple choice questions that were characteristic of medical school examinations.

Wynne brought suit in federal court claiming that the school's failure to offer an alternative to written multiple choice examinations violated his rights under Section 504. *Wynne I*, 932 F.2d at 22. The *Wynne I* Court concluded that, "in determining whether an individual meets the 'otherwise qualified' requirement of section 504, it is necessary to look at more than the individual's ability to meet a program's present requirements." *Wynne I*, 932 F.2d at 22 (considering *Alexander v. Choate*, 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985)). The Court stressed that, while deference need be given to the institutional decisionmakers in deciding whether an accommodation is possible, "there is a real obligation on the academic institution to seek suitable means of reasonably accommodating a handicapped person." *Id.* at 25. Specifically, it found that

> [i]f the institution submits undisputed facts demonstrating that the relevant officials within the institution considered alternative means, their feasibility, cost and effect on the academic program, and came to a rationally justifiable conclusion that the available alternative would result either in lowering academic standards or requiring substantial program alteration, the court could rule as a matter of law that the institution had met its duty of seeking reasonable accommodation.

*Id.* at 26. The *Wynne I* Court remanded the case for a determination of whether Tufts had met its burden "of demonstrating that its determination that no reasonable way existed to accommodate Wynne's inability to perform adequately on written multiple-choice exami-

nations was a reasoned, professional academic judgment, not a mere ipse dixit." *Id.* at 27.

On appeal after remand, the First Circuit decided whether, in fact, Tufts had reached "a rationally justifiable conclusion that accommodating plaintiff would lower academic standards or otherwise unduly affect its program." *Wynne II*, 976 F.2d. at 793. The Court considered voluminous documents that Tufts produced after remand which discussed, among other things, why biochemistry is important to a medical school curriculum, why multiple choice testing was the fairest means of evaluating the subject matter, "what thought [the university] had given to different methods of testing proficiency in biochemistry," and "why it eschewed alternatives to multiple-choice testing, particularly with respect to make-up examinations." *Id.* at 794. The First Circuit concluded that, through evidence of this nature, Tufts had successfully "demythologized the institutional thought processes leading to its determination that it could not deviate from its wanted format to accommodate Wynne's professed disability." *Id.* Tufts met its burden of proving fundamental alteration because it showed that its officials had decided "rationally, if not inevitably, that no further accommodation could be made without imposing and undue (and injurious) hardship on the academic program." *Id.* at 796.

Even more than the dispute over the format of a test in the *Wynne* cases, the degree requirements that are at issue in the instant litigation go to the heart of academic freedom. Universities have long been considered to have the freedom to determine "what may be taught, how it shall be taught, and who may be admitted to study." *Sweezy v. New Hampshire*, 354 U.S. 234, 263, 77 S.Ct. 1203, 1218, 1 L.Ed.2d 1311 (1957) (Frankfurter, J., concurring); *cf. Carlin v. Trustees of Boston Univ.*, 907 F.Supp. 509, 511 (D.Mass. 1995) (Boston University has absolute authority to render an academic judgment, but that decision must be a genuine one).

██ Based on a review of the relevant cases, I conclude that a university can refuse to modify academic degree requirements—even course requirements that students with

learning disabilities cannot satisfy—as long it "undertake[s] a diligent assessment of the available options," *Wynne II,* 976 F.2d at 795, and makes "a professional, academic judgment that reasonable accommodation is simply not available." *Wynne I,* 932 F.2d at 27–28. That is to say, neither the ADA nor the Rehabilitation Act require a university to provide course substitutions that the university rationally concludes would alter an essential part of its academic program. Accordingly, plaintiffs' front-line of attack against any across-the-board policy precluding course substitutions under the ADA and Rehabilitation Act fails.

### 4. *Westling's Ipse Dixit* [35]

As a fallback, the plaintiff class argues: (1) that in the circumstances of this case, BU's refusal to modify its liberal arts degree requirements flunks the *Wynne*-test because Westling was motivated by discriminatory animus in declining to modify the academic standards in question, *cf. Alexander,* 469 U.S. at 301, 105 S.Ct. at 720 (indicating that an entity may not set its standards intentionally to deprive qualified disabled individuals of access), and (2) that BU refused to modify its math and foreign language requirements as an accommodation for the learning disabled without making a diligent, reasoned, academic judgment.

 Based on my review of the record, plaintiffs prevail on both of these arguments. A substantial motivating factor in Westling's decision not to consider degree modifications was his unfounded belief that learning disabled students who could not meet degree requirements were unmotivated (like "Somnolent Samantha") or disingenuous. Although Westling was also inspired by a genuine concern for academic standards, his course substitution prohibition was founded, in part, on uninformed stereotypes. Relying only on popular press accounts that suggested learning disabilities were being unfairly exaggerated and misdiagnosed, Westling pro-

vided no concrete evidence that any BU student faked a learning disability to get out of a course requirement.

Even though Westling may have had a good faith (even passionate) belief in the value of foreign languages to a liberal arts program, the Court finds that he did not dispassionately determine whether the benefits of attaining that proficiency are outweighed by the costs to the learning disabled student. Westling made the decision not to modify the mathematics and foreign language requirements for students with learning disabilities without consulting any experts on learning disabilities. Nor did Westling discuss the importance of foreign language to BU's liberal arts curriculum with any of the relevant BU department heads, professors or officials. Indeed, the only deliberation that took place regarding academic adjustments as accommodations for the learning disabled was Westling's consultation with Klafter about whether scientific evidence supports the existence of a learning disability that prevents foreign language proficiency. Westling's reliance on discriminatory stereotypes, together with his failure to consider carefully the effect of course substitutions on BU's liberal arts programs and to consult with academics and experts in learning disabilities, constitutes a failure of BU's obligation to make a rational judgment that course substitutions would fundamentally alter the course of study. Although BU ultimately has the right to decline to modify its degree requirements—and that decision will be given great deference—it must do so after reasoned deliberations as to whether modifications would change the essential academic standards of its liberal arts curriculum.

## II. *Discrimination Claims Under Article 114*

Article 114 of the Massachusetts constitution ("Article 114"),[36] was derived from and

---

**35.** According to *Black's Law Dictionary* (5th ed.1979), "ipse dixit" means: "He himself said it; a bare assertion resting on the authority of an individual."

**36.** Article 114 provides:

No otherwise qualified handicapped individual shall, solely by reason of his handicap, be excluded from the participation in, denied the benefits of, or be subject to discrimination under any program or activity within commonwealth.

modeled after Section 504 of the Rehabilitation Act of 1973. *See Layne v. Superintendent of Mass. Correctional Inst.*, 406 Mass. 156, 159, 546 N.E.2d 166, 168 (Mass.1989). Because "assistance in construing art. 114" is to be found in the case law that interprets Section 504, *id.*, this Court finds that its conclusions with regard to the plaintiffs' discrimination claims would be no different under Article 114 than under the ADA and Section 504 as determined above.

### III. *Breach of Contract*

Lastly, the named plaintiffs argue that BU is liable for a breach of contract based on binding promises made to them regarding the accommodations that the university would provide for their learning disabilities. In the alternative, they seek relief under the doctrine of promissory estoppel.[37]

### A. *The Legal Landscape*

■ "To state a claim for breach of contract under Massachusetts law, a plaintiff must allege, at a minimum, that there was a valid contract, that the defendant breached its duties under its contractual agreement, and that the breach caused the plaintiff damage." *Guckenberger v. Boston Univ.*, 957 F.Supp. 306, 316 (D.Mass.1997) (citing *Compagnie de Reassurance d'Ile de France v. New England Reinsurance Corp.*, 825 F.Supp. 370, 380 (D.Mass.1993)). Even in the absence of consideration to support a binding contractual agreement between the parties, a party reasonably relying on a promise may prevail under a theory of promissory estoppel. *See Loranger Constr. Corp. v. E.F. Hauserman Co.*, 376 Mass. 757, 384 N.E.2d 176 (1978) (citing *Restatement (Second) of Contracts*, § 89B(2) (1973)). A claim in promissory estoppel is essentially a claim in breach of contract; however, the plaintiff must prove *reasonable reliance* on a promise, offer, or commitment by the defendant rather than the existence of consideration. *See*

*Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841, 850, 647 N.E.2d 1174, 1179 (1995).

■ Under Massachusetts law, the promise, offer, or commitment that forms the basis of a valid contract can be derived from statements in handbooks, policy manuals, brochures, catalogs, advertisements, and other promotional materials. *See Russell v. Salve Regina College*, 890 F.2d 484, 488 (1st Cir.1989), *rev'd on other grounds*, 499 U.S. 225, 111 S.Ct. 1217, 113 L.Ed.2d 190 (1991), *and reinstated on remand*, 938 F.2d 315 (1st Cir.1991) (looking at "various catalogs, manuals, handbooks, etc." to determine the terms of a contractual agreement); *see also Hannon v. Original Gunite Aquatech Pools, Inc.*, 385 Mass. 813, 822, 434 N.E.2d 611, 617 (1982) (finding that "express warranties can be created by an advertising brochure"). So long as the promise is "definite and certain so that the promisor should reasonably foresee that it will induce reliance," *Santoni v. Fed. Deposit Ins. Corp.*, 677 F.2d 174, 179 (1st Cir.1982), and reliance occurs, a party can maintain an action for breach, *see Rhode Island Hosp. Trust Nat'l Bank*, 419 Mass. at 848–850, 647 N.E.2d 1174.

■ It is well-established that, although "[t]he relationship between a university and a student is contractual in nature," *see Corso v. Creighton Univ.*, 731 F.2d 529, 531 (8th Cir.1984), as far as contract actions go, "courts should be slow to intrude into the sensitive area of the student-college relationship, especially in areas of curriculum and discipline." *Russell v. Salve Regina College*, 890 F.2d at 489 (upholding jury verdict where nursing school forced student out because she was obese after admitting her with full knowledge of her weight condition because under these circumstances, the "unique" position of the college as educator is "less compelling"). Even though "some elements of the law of contracts are used and

---

Mass. Const. amend. art. CXIV.

**37.** In *Guckenberger v. Boston Univ.*, 957 F.Supp. 306, 317–318 (D.Mass.1997), this Court dismissed the promissory estoppel count in the plaintiff's complaint as essentially moot based on BU's representation that under a standstill agreement that was reached after the initiation of this litigation, BU agreed to honor all documented promises made to a learning-disabled student enrolled at the university. The dismissal was without prejudice to plaintiff's reliance claims "if the breach of contract count ultimately should fail." *Id.* at 318.

should be used in the analysis of the relationship between [student] and the university," because "[t]he student-university relationship is unique," contract law need not be "rigidly applied." *Lyons v. Salve Regina College,* 565 F.2d 200, 202 (1st Cir.1977) (quoting *Slaughter v. Brigham Young Univ.,* 514 F.2d 622, 626 (10th Cir.1975)) (internal quotation marks omitted).

### B. *BU's Brochures*

The plaintiffs base their breach of contract claim in large part on BU's promotional materials describing the services that the university makes available to students with learning disabilities. In brochures promoting the university's LDSS office, for example, BU touted a "highly trained staff," the option of "reasonable accommodations in testing and coursework" (including course substitutions), and the chance to attend a specialized comprehensive summer orientation program. None of these LDSS brochures contained a disclaimer. A now obsolete LDSS pamphlet explains that, although students must complete a diagnostic evaluation to receive LDSS services initially, once accommodations had been authorized, "these services will be available throughout the student's academic career."

BU asserts that, because of the nature of the university-student relationship, as a matter of law, a university cannot be deemed to have breached a "contract" with its students when it exercises its inherent right to change the nature of its academic programs. Moreover, BU contends that its admissions office actually did not distribute the primary brochure upon which the breach of contract claim is based, and that, in light of the disclaimer that appears in many of BU's catalogs and brochures,[38] the university had no reasonable expectation that the students would depend upon its promotional materials.

Even assuming *arguendo* that statements in a university's promotional materials can form the basis of a binding contractual agreement with its students, the Court concludes that at best, only one of the plaintiffs (Scott Greeley) entered into such an agreement in this case because he is the only one who testified he received and relied on the brochure. None of the other plaintiffs have testified that they relied on these brochures' general representations of policy in deciding to matriculate at BU. There being no proof of an offer (based on the brochures), acceptance, or of detrimental reliance, these other plaintiffs have failed to prove a breach of contract (or, alternatively, promissory estoppel claim) arising out of statements that the university may have made in its materials promoting the disability services program.

### C. *Express Promises*

Three of the named plaintiffs persuasively explained at trial that they were induced to attend BU in reliance on specific promises made to them personally regarding their ability to receive certain accommodations.

Plaintiff Avery LaBrecque credibly described in detail conversations that she had had with LDSS director Loring Brinckerhoff before she began at BU during which he promised her a course substitution for foreign language in light of her history of difficulty with foreign language learning. When plaintiff Scott Greeley and his father flew from California to Boston to investigate BU's support for students with learning disabilities in deciding whether to attend, LDSS coordinator Carolyn Suissman assured Greeley that, with his accommodations history and documentation, he would have "no problem" getting the assistance that he needed. Greeley was the only plaintiff who testified he had received the LDSS brochure prior to matriculating. Similarly, one of the letters that Elizabeth Guckenberger received from the

---

**38.** For example, BU's *Viewbook and Application* for 1996/97 states: "The University reserves the right to change course content, fees, program requirements, plans of study, class schedules, and the academic calendar, or to make other changes deemed necessary or desirable, giving advance notice of change where possible." Similarly, the catalog for the college of General Stud-

ies provides: "Boston University reserves the right to change the policies, fees, curricula, or any other matter in this publication without prior notice and to cancel programs and courses. This publication is to be read neither as part of a contractual agreement nor as a guarantee of the classes, courses, or programs described herein."

director of admissions at BU Law School, which purported to describe what "is considered reasonable for documentation," explained that students with learning disabilities needed to submit an evaluation that had been prepared by "a professional qualified to diagnose a learning disability, including but not limited to a licensed physician, *learning disability specialist*, or psychologist." (Emphasis added). The letter also stated that the evaluation needed to be "dated no more than three years prior to the date of the application, unless the documentation was completed during the [student's] undergraduate education." (Emphasis omitted).

■■■■■ BU made specific promises to these three individual students and, during the 1995–1996 school year, BU reneged on its representations. Rather than the promised course substitution for her foreign language obligation, BU required LaBrecque to take Swahili, a language that had both an oral and a written component. Greeley labored from August until December of his freshman year without LDSS support and, just prior to finals, he was informed that his request for exam accommodations had been denied because of inadequate documentation. When Guckenberger sought to submit her learning disabilities specialist's evaluation so that she could get exam accommodations during her second year of law school, she was told that she would have to be completely retested for dyslexia within the three weeks prior to exams.

The Court concludes that there was an enforceable contractual agreement between BU and Avery LaBrecque, Scott Greeley, and Elizabeth Guckenberger based on specific statements made by BU officials that were relied upon by these students, and that BU breached these express promises to their detriment.

IV. *Damage Claims of the Named Plaintiffs* [39]

■■■■■ The Court considers now whether and to what extent the named plaintiffs are entitled to damages on the basis of BU's

discriminatory actions and contract breach. *See Jacques v. Clean–Up Group, Inc.,* 96 F.3d 506, 511 (1st Cir.1996) (finding that, in an employment discrimination claim under the ADA, plaintiff must show that she has actually been discharged or has suffered "an adverse employment action" as a result of her disability); *Katz v. City Metal Co., Inc.,* 87 F.3d 26, 30 (1st Cir.1996) (same); *Doherty v. Southern College of Optometry,* 862 F.2d 570, 573 (6th Cir.1988) (finding that among the elements of a Section 504 claim is proof that plaintiff actually is "being excluded from participation in, being denied the benefits of, or being subject to discrimination" on the basis of his handicap); *D'Amico v. New York State Board of Law Examiners,* 813 F.Supp. 217, 221 (W.D.N.Y.1993) (stating that in order to prevail on an ADA claim, a plaintiff must show "(1) that she is disabled, (2) that her requests for accommodation are reasonable, and (3) that those requests have been denied"). Compensatory damages are not available to private parties under Title III of the ADA. *See* 42 U.S.C. § 12188; *see generally* Mary L. Topliff, Annot., *Remedies Available under Americans with Disabilities Act,* 136 A.L.R. Fed. 63, §§ 14–16 (1996). In contrast, compensatory damages under a private cause of action are available under Section 504. *See, e.g., W.B. v. Matula,* 67 F.3d 484, 494 (3d Cir.1995) (citing *Franklin v. Gwinnett County Pub. Sch.,* 503 U.S. 60, 66, 112 S.Ct. 1028, 1032–1033, 117 L.Ed.2d 208 (1992) (concerning monetary damages under Title IX)); *Rodgers v. Magnet Cove Public Schs.,* 34 F.3d 642, 645 (8th Cir.1994); *Wood v. President & Trustees of Spring Hill College,* 978 F.2d 1214, 1218 (11th Cir.1992).

■■■■■ To state a claim for damages under the Rehabilitation Act, a plaintiff must prove the following elements:

(1) The plaintiff is a "handicapped person" under the Act; (2) The plaintiff is "otherwise qualified" for participation in the program; (3) The plaintiff is being excluded from participation in, being denied the benefits of, or being subjected to discrimi-

---

**39.** In addition to prospective, injunctive relief as members of the class, some of the named plaintiffs seek damages as a result of BU's past conduct in the administration of its accommodations policy for students with learning disabilities.

nation under the program solely by reason of his handicap; and (4) The relevant program or activity receiving is Federal financial assistance.

*Doherty v. Southern College of Optometry*, 862 F.2d 570, 573 (6th Cir.1988). To award damages, a court must find intentional discrimination because "good faith attempts to pursue legitimate ends are not sufficient to support an award of compensatory damages under Section 504." *Wood*, 978 F.2d at 1219 (collecting cases).

BU does not appear to dispute that any of the named plaintiffs are disabled individuals who are otherwise qualified within the meaning of Section 504. Because I have found that BU's conduct during the 1995–1996 school year subjected many students to discrimination, in violation of the ADA and the Rehabilitation Act and also amounted to a breach of contract in certain instances, I focus here on the manner and the extent to which the individual plaintiffs have been harmed by BU's indiscretions.

1. *Elizabeth Guckenberger* has proven that BU violated the ADA, 42 U.S.C. § 12182(b)(2)(i) and the Rehabilitation Act, 29 U.S.C. § 794 by requiring her to be entirely retested for dyslexia under unnecessary eligibility criteria. This violation caused her $800 in economic damages, the amount of the retesting. She has also proven that the method of administering the program for providing reasonable accommodations was discriminatory in violation of the ADA, 42 U.S.C. § 12182(a) and (b)(1)(D) and 29 U.S.C. § 794 because BU officials intentionally did not give students timely or sufficient advance notice of the new policy in order to enable them to meet the requirements before upcoming examinations. Although BU eventually postponed the effective date of the new policy, the discriminatory administration of the program in the 1995–1996 academic year caused her emotional distress. I award $5,000 for the emotional distress.

Guckenberger also proved that BU breached its contract with her when it failed to honor its written, pre-enrollment promise that documentation completed during a student's undergraduate education by a learning disabilities specialist would be accepted. The

breach of contract caused Guckenberger $800 for retesting. The total amount of damages is $5,800.

2. *Avery LaBrecque* has proven that BU violated the ADA, 42 U.S.C. §§ 12182(a), (b)(1)(D), and (b)(2)(A)(ii) and the Rehabilitation Act, 29 U.S.C. § 794 by unreasonably delaying action on her request for a reasonable accommodation for a well documented language-based learning disability, and by not notifying her in a timely way as to the change in policy regarding course substitutions.

Even though I find that accommodation eventually provided by President Westling (i.e., that she be required to learn the oral component of a language) was reasonable in light of the documentation provided, her request for an accommodation was made early in the semester in September, but was not provided until November. I find that BU's initial denial of *any* effective accommodation in October was based in part on an impermissible, discriminatory stereotype that many learning disabled students are lazy and can meet the degree requirements if they try hard enough without accommodation. The portion of the evaluator's report referenced in Westling's November 10, 1995 letter was initially presented to him as part of the 28 files on October 5, 1995. Dr. Seigel testified there was "good justification for accommodations." In part, the initial denial resulted from the administration of the program which had the effect, here, of discriminating against LaBrecque by intentionally failing to give her timely notice of the basis of the denial, or the change in policy regarding course substitutions.

LaBrecque has proven that she suffered emotional distress as a result of the discriminatory method of administering the program, which resulted in her dropping out of school and psychiatric treatment. The court awards $5,000 for emotional distress, and $8,000 for psychiatric bill for a total of $13,000.

LaBrecque has also proven that BU breached its oral agreement with her that she would be afforded course substitutions in foreign language, but has not proven that

any damages were proximately caused by that breach.

3. *Benjamin Freedman* has not proven that any accommodations were delayed or denied, that any promises were broken, or any unnecessary tests taken. Accordingly, I award him $1.00 in nominal damages.

4. *Jill Cutler* has proven that BU violated 42 U.S.C. § 12182(b)(2)(i) and 29 U.S.C. § 794 by requiring her to be entirely retested for dyslexia under unnecessary eligibility criteria at a cost of $650.00. However, Cutler's accommodations were not denied or delayed, and the administration of the program did not have a discriminatory effect on her. Because I do not find that the design of the eligibility criteria was substantially motivated by an intent to discriminate against learning disabled students but rather primarily to improve the quality of documentation, I do not award damage for Cutler's emotional distress resulting from the re-testing.

5. *Scott Greeley* has proven that BU violated 29 U.S.C.. § 794 and 42 U.S.C. § 12182(b)(2)(i) by requiring him to be retested under unnecessary eligibility criteria. This also constituted a breach of contract. However, there is no evidence in the record as to the cost of the retesting. He has also proven that the method of administering the program for providing reasonable accommodations was discriminatory in violation of 42 U.S.C. § 12182(a) and (b)(1)(D) because BU officials intentionally failed to give him timely or sufficient advance notice of the new policy in order to enable him to meet the requirements before upcoming examinations, intentionally delayed in providing him any decision regarding his request for reasonable accommodations, failed for six months to provide him with reasonable accommodations in violation of 42 U.S.C. § 12182(b)(2)(A)(ii) and 29 U.S.C. § 794. Most importantly, BU intentionally discriminated against Greeley by initially denying him any accommodations. In the November 2, 1995 letter, Westling writes: "The proposed accommodation of requiring the instructor to provide an opportunity to clarify test questions is not supported by the 'educational therapist' who evaluated Mr. Greeley." While Westling was fairly concerned about this unusual accommodation, other standard accommodations had also been recommended: Time and one-half to complete exams, use of a notetaker and/or tape recorder for class lectures, and use of books-on-tape as necessary. Dr. Seigel testified that reasonable accommodations were appropriate, but agreed she had never seen the opportunity to clarify test questions before as an accommodation. Rather than simply denying the clarification accommodation, BU denied all accommodations. As a result of BU's discriminatory policy, Greeley suffered extreme emotional anxiety and depression, conditions that had physical manifestations (e.g. severe acne and weight gain) and economic ramifications (e.g. loss of his scholarship). I award Greeley $10,000 for emotional distress.

6. *Jordan Nodelman* has not demonstrated that he has suffered any uncompensated harm resulting from any of BU's actions during the initial implementation of its accommodations policy, and I award only nominal damages.

## ORDER OF JUDGMENT

1. The Court orders BU to cease and desist implementing its current policy of requiring that students with learning disorders (not ADD or ADHD) who have current evaluations by trained professionals with masters degrees and sufficient experience be completely retested by professionals who have medical degrees, or doctorate degrees, or licensed clinical psychologists in order to be eligible for reasonable accommodations.

2. The Court orders BU to propose, within 30 days of the receipt of this order, a deliberative procedure for considering whether modification of its degree requirement in foreign language would fundamentally alter the nature of its liberal arts program. Such a procedure shall include a faculty committee set up by the College of Arts and Sciences to examine its degree requirements and to determine whether a course substitution in foreign languages would fundamentally alter the nature of the liberal arts program. The faculty's determination will be subject to the approval of the president, as university by-laws provide. As provided in *Wynne*, BU shall report back to the Court by

the end of the semester concerning its decision and the reasons. In the meantime, the university shall process all requests for a reasonable accommodation involving a course substitution in foreign language, and shall maintain records of such students. BU is not required to grant such a course substitution in the area of foreign language until its deliberation process is complete.

3. The Court orders entry of judgment for plaintiffs in the following amounts:

a. Elizabeth Guckenberger: $5,800.

b. Avery LaBrecque: $13,000.

c. Benjamin Freedman $1.00

d. Jill Cutler $650.00.

e. Scott Greeley $10,000.

f. Jordan Nodelman $1.00

**SO ORDERED.**